CHRISTOPHER M. MCDERMOTT (SBN 253411)
cmcdermott@piteduncan.com
TODD S. GARAN (CA SBN 236878)
tgaran@piteduncan.com
GREGORY P. CAMPBELL (CA SBN 281732)
gcampbell@piteduncan.com
PITE DUNCAN, LLP
4375 Jutland Dr., Ste. 200
P.O. Box 19734
San Diego, CA 92177-9734
Telephone: (858) 750-7600
Facsimile:  (619) 590-1385

Attorneys for  JPMorgan Chase Bank, National Association

# UNITED STATES BANKRUPTCY COURT

# EASTERN DISTRICT OF CALIFORNIA – SACRAMENTO DIVISION

| | |
|---|---|
| In re<br><br>6056 SYCAMORE TERRACE LLC,<br><br>Debtor. | Case No. 13-34541<br><br>D.C. No [CAH-7]<br><br>Chapter 11<br><br>**OBJECTION TO CONFIRMATION OF DEBTOR'S CHAPTER 11 PLAN OF REORGANIZATION**<br><br>**PROPERTY ADDRESS**:<br><br>6056 Sycamore Terrace,<br>Pleasanton, CA  94566<br><br>**DISCLOSURE HEARING**:<br><br>Date:   February 3, 2014<br>Time:   10:00 A.M.<br>Place:  Bankruptcy Court<br>501 I Street, Sacramento, CA<br>Courtroom 28, Department A |

JPMorgan Chase Bank, N.A.[1] ("**Chase**"), secured creditor of the above-entitled Debtor, 6056 Sycamore Terrace LLC ("**Debtor**"), hereby submits its Objection to Confirmation of the Debtor's

---

[1] This Objection shall not constitute a waiver of the within party's right to receive service pursuant to Fed. R. Civ. P. 4, made applicable to this proceeding by Fed. R. Bankr. P. 7004, notwithstanding Pite Duncan, LLP's participation in this proceeding. Moreover, the within party does not authorize Pite Duncan, LLP, either expressly or impliedly through Pite Duncan, LLP's participation in this proceeding, to act as its agent for purposes of service under Fed. R. Bankr. P. 7004.

proposed Chapter 11 Plan of Reorganization ("**Objection**").[2] The basis of the Objection is stated below:

**I.**

**STATEMENT OF FACTS**

1. On October 5, 2007, Hossein Bozorgzad ("**Borrower**") executed a Note in the principal sum of $1,815,000.00 (the "**Note**") to Washington Mutual Bank, FA ("**WAMU**"). The Note reflects that WAMU indorsed the Note in blank. A copy of the Note is attached to the concurrently filed exhibits ("**Exhibits**") as **Exhibit A** and incorporated herein by reference.

2. On October 5, 2007, Borrower executed a Deed of Trust (the "**Deed of Trust**") granting WAMU a security interest in certain real property located at 6056 Sycamore Terrace, Pleasanton, CA 94566 ("**Property**"), which is more fully described in the Deed of Trust. The Deed of Trust reflects that it was recorded in the official records of the Alameda County Recorder's Office. A copy of the Deed of Trust is attached to the Exhibits as **Exhibit B** and incorporated herein by reference. The Note and Deed of Trust are collectively referred to as the "**Subject Loan**".

3. Subsequently, WAMU's interest in the Deed of Trust was assigned to Chase. A copy of the Assignment of the Deed of Trust is attached to the Exhibits as **Exhibit C** and incorporated herein by reference.

4. On or about May 18, 2012, Borrower allegedly executed and recorded an unauthorized Grant Deed purporting to transfer his interest in the Property to 6056 Sycamore LLC, the Debtor herein.[3] A copy of the unauthorized Grant Deed is attached to the Exhibits as **Exhibit D** and incorporated herein by reference.

5. On November 14, 2013, Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code and was assigned bankruptcy case no. 13-34541.

6. On December 12, 2013, Chase obtained an interior appraisal of the Property. The Appraisal Report indicates that the Property has a current value of $2,250,000.00 as of December 12, 2013. A copy of the Appraisal Report and Declaration in Support thereof are collectively attached to

---

[2] Chase does not consent to the Court's resolution of the disputed factual issues based on the pleadings and reserves its right for an evidentiary hearing if the parties are unable to resolve their dispute.

[3] Chase reserves its right to contest Debtor's ability to modify Chase's claim through a Chapter 11 Plan as the Debtor is not a Borrower under the Subject Loan.

- 2 -

the Exhibits as **Exhibit E** and incorporated herein by reference. The Appraisal Report is supported by the concurrently filed Declaration of Peter Iversen ("**Iversen Declaration**"). The Iversen Declaration states that Mr. Iversen is a licensed real estate appraiser familiar with real estate values in the area surrounding the Property. Mr. Iversen has worked as a real estate appraiser since 1965. (*See* Iversen Declaration, Page 1).

7. On December 16, 2013, Debtor filed its Motion to Value Collateral ("**Motion to Value**"). (*See* Docket No. 20). The Debtor's Motion to Value proposes to reduce Chase's claim in the approximate sum of $2,231,587.82[4] to $1,600,000.00, the alleged value of the Property.

8. On December 23, 2013, Debtor filed its proposed Chapter 11 Plan of Reorganization ("Plan") and Disclosure Statement. (*See* Docket Nos. 39-40). Debtor's Plan proposes to reduce Chase's secured claim in the approximate sum of $2,231,587.82 to $1,600,000.00, the alleged value of the Property. Further, the Plan proposes to amortize Chase's claim over forty (40) years with a stepped-up interest rate schedule. First, the Debtor proposes to make *interest-only payments* at 3.00% interest for months 1-24 with a monthly payment of $4,000.00, which apparently will include an impound for taxes and insurance. Thereafter, for months 25-60, the Debtor proposes *interest only payments* at 4.00% interest with a monthly payment of $5,333.33. Finally, the Debtor proposes a fixed rate of 4.50% with monthly payments of principal and interest of $7,572.11 for the remainder of the term (35 years). Although the Plan states that the "property taxes and insurance of the property will be included" in the payments, the Plan goes on to state that the "property taxes, insurance, and other expenses of the property will be paid direct by Debtor." (*See* Plan, Pages 5-6).

9. The Disclosure Statement indicates that the Debtor filed for bankruptcy protection shortly after the scheduling of a foreclosure sale of the Property. (*See* Disclosure Statement, Page 21). With respect to implementation of the Plan, it appears that the estate's only income is derived from rental income for the Property in the monthly sum of $8,900.00. However, the Property is currently vacant. (*See* Plan, Page 12). Further, the Disclosure Statement acknowledges that "[b]ecause the bulk of the Debtor's income resolves around rental income, loss of the current Tenant could severely threaten the feasibility of the Plan." (*See* Disclosure Statement, Page 10). The

---

[4] This claim amount is based on the value listed on Debtor's Schedule D. Chase is in the process of preparing and filing a Proof of Claim and reserves it right to contest the scheduled amount of its secured claim.

1 Disclosure Statement lists monthly expenses for the Property in the sum of $2,982.00 for property taxes, insurance, maintenance, gardening, pool service, home warranty, and management fees. (*See* Disclosure Statement, Page 28).

10. On January 21, 2014, the court held a hearing on the Debtor's Motion to Value. The court denied the Debtor's Motion to Value and adopted Chase's valuation of the Property.

Chase now submits its Objection to Confirmation of the Plan.

## II.

## **ARGUMENT**

### A. THE DEBTOR IS PROHIBITED FROM MODIFYING CHASE'S CLAIM AS THE DEBTOR IS NOT THE BORROWER UNDER THE SUBJECT LOAN

#### 1. The Proposed Modification of Chase's Claim Violates 11 U.S.C. § 524

11 U.S.C. § 524(a)(2) states that the effect of a discharge "operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived." 11 U.S.C. § 524(a)(2). In other words, section 524(a) provides for the discharge of personal liability on certain debts of the debtor. Section 524 does not, however, provide for the release of personal liability for a third party non-debtor. To the contrary, 11 U.S.C. § 524(e) provides that a "discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for, such debt." 11 U.S.C. § 524(e). The bankruptcy court does not have the authority to release the liability of non-debtors, and a plan which contains such a provision may not be confirmed. *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995). The Ninth Circuit has repeatedly reiterated this principal when a debtor seeks to affect the liability of a non-debtor in his bankruptcy. *See In re American Hardwoods, Inc.*, 885 F.2d 621, 626 (9th Cir. 1989) (§ 105(a)'s grant of equitable powers does not permit a court to issue an injunction against creditors that would prevent creditors from enforcing the obligations of non-debtors); *In re Sun Valley Newspapers, Inc.*, 171 B.R. 71, 77 (9th Cir. BAP 1994) (holding reorganization plans which proposed to release non-debtor guarantors violated § 524(e) and were therefore unconfirmable). "[T]he mechanics of administering the federal bankruptcy laws, no matter how suggestive, do not operate as a private

1  contract to relieve co-debtors of the bankrupt of their liabilities." *Seaport Automotive Warehouse,*
2  *Inc. v. Rohnert Park Auto Parts, Inc. (In re Rohnert Park Auto Parts, Inc.)*, 113 B.R. 610, 616 (9th
3  Cir. BAP 1990) citing *Union Carbide Corp. v. Newboles*, 686 F.2d 593, 595 (7th Cir. 1982). The
4  court in *In re Solis* relied on § 524(e), in part, in denying confirmation of a debtor's plan that
5  proposed to cram down a claim secured by a vehicle as it sought to affect the liability of a non-
6  debtor. *In re Solis*, 356 B.R. 398 (Bankr. S.D. Tex. 2006).

7  In the present case, Debtor is not personally liable under the loan documents. Despite this
8  fact, Debtor is proposing to modify the terms of the Loan on the basis that Debtor purportedly
9  acquired an interest in the Property via an unauthorized grant deed and, as a result, asserts that Chase
10 has a claim against Debtor's bankruptcy estate subject to modification pursuant to § 506(a) and §
11 1123(b)(5). Indeed, the Debtor's Plan proposes to modify the Loan executed between the Borrower
12 and the Lender, for which the Borrower is liable.

13 Clearly, such proposed treatment of the Loan amounts to a drastic modification of the
14 obligations of the Borrower, who is not a debtor in the instant case. If Debtor is permitted to modify
15 the Loan in its Plan, it will result in substantial confusion as to the rights and obligations between the
16 Borrower, Debtor, and Chase, which, in turn, will result in conflicting obligations. Here, the two
17 parties (i.e., the Borrower and Debtor) would be responsible for making payments on the Loan under
18 different terms. The Borrower would be responsible for making principal and interest payments
19 pursuant to the terms of the Loan and would be subject to the various rights and responsibilities
20 prescribed under the original terms. However, Debtor would be obligated to make payments on the
21 Loan pursuant to the provisions of the confirmed Plan. These conflicting obligations pose an
22 administrative burden for all parties.

23 Assuming Debtor's Plan proposes to completely eliminate the Lender-Borrower relationship
24 (which appears to be the case), this is clearly in violation of Section 524(e) as it seeks to discharge
25 the liability of a non-debtor under the Loan. Specifically, if the non-debtor obligor is no longer
26 required to make principal and interest payments on the Loan or otherwise comply with the terms of
27 the loan documents, the Plan necessarily seeks to discharge the personal liability of a non-filing
28 obligor (i.e., the Borrower). Based on the foregoing, the Plan violates 11 U.S.C. § 524(e) and

confirmation must be denied.

### 2. The Supreme Court's Holding in *Johnson* Does Not Permit the Modification of Chase's Claim

11 U.S.C. § 101(5) defines a "claim" as a "right to payment." § 101(5)'s definition of a claim has been interpreted broadly to include a right to payment enforceable against either the debtor or his property. *Johnson v. Home State Bank*, 501 U.S. 78, 85 (1991). However, the holding in *Johnson* must be limited to its peculiar facts, which are clearly distinguishable from the instant case.

Specifically, *Johnson* is distinguishable on two grounds. First, in *Johnson*, the debtor was the **original obligor** on the promissory note and deed of trust encumbering the real property subject to foreclosure. Additionally, in *Johnson*, the **debtor had been discharged** of all personal liability on his note through Chapter 7 bankruptcy. Here, Debtor is **not** the obligor under the loan documents encumbering the Property. Instead, the Debtor received its ownership interest in the Property through an unauthorized transfer. While the Supreme Court in *Johnson* stated "Congress intended by [the language of 11 U.S.C. § 101(5)] to adopt the broadest available definition of 'claim,'" the Court contemplated this broad definition under *Johnson's* facts where the debtor was the obligor on the promissory note, Johnson had been discharged from liability under the note in a previous Chapter 7 bankruptcy, and no other party remained liable under the note. *See Johnson*, 501 U.S. at 83 Consequently, because Johnson was the obligor in that case and no other party was liable under the note, the Court's explanation that "there can be no doubt that the surviving mortgage interest corresponds to an 'enforceable obligation' of the debtor," applies only to the factual situation in which the debtor/obligor's personal liability has been extinguished only to have the creditor's right to foreclose on the deed of trust encumbering the debtor/obligor's property survive. *Id.*

Moreover, the *Johnson* Court's consideration of 11 U.S.C. § 102(2), which maintains that a "'claim against the debtor' includes a claim against the property of the debtor" again considers only the common circumstance where the debtor is also the original obligor and only obligor. *Id*. at 85. Within the context of these limited facts, Johnson's obligation under the mortgage was deemed to have the "same properties as a nonrecourse loan" and, therefore, the court determined that the creditor had a claim against Johnson's bankruptcy estate. *Id.* at 86-87. However, the anomalous

- 6 -

circumstances currently before the Court require a different conclusion. Here, Debtor is not an obligor on the Loan. Further, the Borrower remains liable under the Loan despite Debtor's current bankruptcy filing and proposed Plan. Because the *Johnson* court considered the creditor's mortgage interest to be tantamount to a non-recourse loan only where the debtor was also the obligor and sole obligor, the Court's holding that the creditor's interest in the debtor's property was included in § 101(5)'s definition of a "claim" cannot be applied to the instant case. Therefore, based on the foregoing factual distinctions with *Johnson's* interpretation of a "claim," Chase does not have a claim against Debtor's bankruptcy estate under § 101(5).

Second, in the event this Court determines that Chase indeed has a claim against the Debtor's bankruptcy estate, a more profound factual distinction exists between *Johnson* and the instant case which defeats the Debtor's proffered treatment of Chase's claim. This distinction lies in the treatment of the Chase's claim in the Debtor's proposed Plan and the remaining liability of the Borrower. In *Johnson*, the debtor sought to make four annual installments and a final balloon payment to satisfy a state court in rem judgment against Johnson's property in the amount of $200,000.00. Here, Debtor is not attempting to cure a judgment or default, but rather is attempting to restructure the terms of the Loan. In particular, the Debtor seeks to reduce the principal balance under § 506(a) and amortize the claim over forty (40) years at an interest-only stepped-up rate schedule. Surely satisfying a state court judgment against a property (**an involuntary lien**) with annual installments, as was the case in *Johnson*, as compared to modifying the terms of Loan (**a voluntary lien**) is a drastically different treatment of a creditor's "claim."

Additionally, the Debtor's proposed treatment seeks to greatly modify the obligations of the Borrower under the Loan. If this Court determines that Chase has a claim against the Debtor's bankruptcy estate, despite the fact that Debtor is not an obligor, and the Debtor is permitted to modify or eliminate the Borrower's obligations under the Loans pursuant to Debtor's Plan, the contractual relationship between the Borrower and Chase is effectively severed. As previously addressed, by eliminating the contractual relationship between the Borrower and Chase, Debtor is in violation of § 524(e) for discharging the debt of a non-debtor. *In re Lowenschuss*, 67 F.3d 1394 (9th Cir. 1995).

**3.     Public Policy Favors Prohibiting Modification.**

The Court must consider the public policy implications of permitting the Debtor to modify Chase's claim. If the Court permits the Debtor to modify the Loan, it would send a message to other delinquent borrowers that a loan may be modified simply by recording an unauthorized grant deed and transferring interest in the collateral to a third party prior to a Chapter 11 bankruptcy filing. Further, the allowance of a modification to Chase's claim in this case, effectively permits a non-debtor to utilize the Bankruptcy Code without ever filing for bankruptcy. Such a decision would set a dangerous precedent resulting in a manipulation of the Bankruptcy Code to the detriment of secured creditors and "offend[s] traditional commercial and contract law precepts." *See In re Kizelnik*, 190 B.R. 171, 179 (Bankr. S.D.N.Y. 1995).

**B.    EVEN ASSUMING ARGUENDO THAT THE COURT PERMITS MODIFICATION OF CHASE'S CLAIM, THE DEBTOR'S PLAN PROPOSES TO REDUCE CHASE'S CLAIM BELOW THE FAIR MARKET VALUE OF THE PROPERTY**

11 U.S.C. §1123(b)(5) provides that a plan may modify the rights of holders of secured claims, other than a claim secured only be a security interest in real property that is the debtor's principal residence.  11 U.S.C. § 506(a) provides that an allowed claim of a creditor secured by a lien on property in which the estate has an interest…is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property.

In the present case, the Debtor's Plan proposes to reduce Chase's claim in the approximate sum of $2,231,587.82 to $1,600,000.00, the alleged value of the Property. The Debtor failed to file a verified appraisal report or declaration from a certified residential appraiser to support its proposed valuation. Rather, the Motion to Value is supported by a Declaration from the original Borrower. (*See* Docket No. 22). The Bozorgzad Declaration states that the Borrower is the managing member of the Debtor and indicates that the value of the Property is based on the Borrower's opinion. (*See* Bozorgzad Declaration, Page 2). However, it is unclear if Mr. Bozorgzad is a licensed real estate appraiser or qualified to conduct real property valuations. Moreover, it does not appear that the Borrower's opinion of value is based on his personal opinion of value as the Borrower testified at the 341 Meeting that his valuation of the Property is based on appraisal obtained by Chase during one of

- 8 -

the Debtor's prior loan modification efforts. Further, the Borrower stated that he spoke with the appraiser who conducted the prior appraisal who informed the Borrower of the Property's value. (*See* McDermott Declaration, Docket No. 53). Accordingly, the court should disregard the Borrower's opinion of value as it does not appear the Borrower is qualified to offer an opinion of the value of real estate in the area and the Borrower's statements are, at best, hearsay.

Chase is informed and believes that the value of the Property is significantly greater than the Debtor's proposed valuation. Indeed, Chase is in possession of an interior Appraisal Report, dated December 12, 2013, indicating that the Property has a current value of $2,250,000.00. (*See* Exhibit E and Iversen Declaration). At the hearing on the Debtor's Motion to Value, the court denied the Debtor's Motion and adopted Chase's valuation. Accordingly, Chase's claim in the approximate sum of $2,231,587.82 must be allowed in full pursuant to 11 U.S.C. § 506. Based upon the foregoing, Chase requests that the Court deny confirmation of the Plan.

**C.     THE DEBTOR'S PLAN ATTEMPTS TO REDUCE THE INTEREST RATE PAID ON CHASE'S CLAIM WITHOUT IMPLEMENTING THE PRIME-PLUS FORMULA**

**1.     The Interest Rate Proposed by the Debtor's Plan is Not Fair and Equitable and Fails to Implement the Prime-Plus Formula**

In the case of *Till v. SCS Credit Corp.*, 541 U.S. 465, (2004), the Supreme Court adopted a two-part "prime-plus" formula for determining the proper interest rate a debtor should pay on a secured claim that complies with the "cram down" provisions of the Bankruptcy Code. The Supreme Court in *Till* stated that:

> "the approach begins by looking to the national prime rate, reported daily in the press, which reflects the financial market's estimate of the amount a commercial bank should charge a creditworthy commercial borrower to compensate for the opportunity costs of the loan, the risk of inflation, and the relatively slight risk of default. Because bankrupt debtors typically pose a greater risk of nonpayment than solvent commercial borrowers, the approach then requires a bankruptcy court to adjust the prime rate accordingly. The appropriate size of that risk adjustment depends, of course, on such factors as the circumstances of the estate, the nature of the security, and the duration and feasibility of the reorganization plan." *Id.* at 478-479.

1    In discussing the "prime-plus" interest rate calculation, the Supreme Court went on to
2 explain that in starting from a concededly *low* estimate and adjusting *upward*, the evidentiary burden
3 is placed squarely on the creditors, who are likely to have readier access to any information absent
4 from the debtor's filing. *Id.* at 479. In *In re Fowler*, the Ninth Circuit held that under the formula
5 approach, that a court "starts with a base rate, either the prime rate or the rate on the treasury
6 obligation, and then adds a factor based on the risk of default and the nature of the security (the risk
7 factor)." *In re Fowler*, 903 F.2d 694, 697 (9th Cir.1990). The current prime rate is 3.25%.
8 FedPrimeRate, Current Wall Street Journal Prime Rate, FedPrimeRate.com (January 16, 2014, 1:10
9 p.m.), http://www.wsjprimerate.us/.

10   In the present case, the Plan proposes to amortize Chase's claim over forty (40) years with a
11 stepped-up interest rate schedule. First, the Debtor proposes to make ***interest-only payments*** at
12 3.00% interest for months 1-24 with a monthly payment of $4,000.00, which apparently will include
13 an impound for taxes and insurance. Thereafter, for months 25-60, the Debtor proposes ***interest
14 only payments*** at 4.00% interest with a monthly payment of $5,333.33. Finally, the Debtor proposes
15 a fixed rate of 4.50% with monthly payments of principal and interest of $7,572.11 for the remainder
16 of the term (35 years). However, Chase maintains that if the appropriate "prime-plus" formula is
17 used, as prescribed in the *Till* case, the calculated interest rate to be paid by the Debtor will be
18 significantly higher. Further, Debtor must make principal and interest payments rather than lower
19 interest-only payments. In addition, Chase recognizes that as required in the *Till* case, the burden of
20 proof for establishing the higher interest rate falls on the creditor, and as a result, Chase is prepared
21 to offer expert testimony at an evidentiary hearing in order to establish the appropriate interest rate
22 to be paid by the Debtor, if the parties are unable to agree to a resolution of the applicable interest
23 rate on Chase's secured claim. Accordingly, the Court must deny confirmation of the Debtor's Plan
24 or, in the alternative, require the Debtor to amend the Plan to remedy the above-referenced defects.

**2. The Debtor's Proposed Interest Rate Fails to Incorporate the Debtor's Default Risk**

27   Once the base rate is determined, the risk of default and nature of the security (the "risk
28 factor") is added to the base rate. *In re Fowler*, 903 F.2d at 697. In *Fowler*, the Ninth Circuit stated

that in assessing risk a court should scrutinize the expenses and revenue projections of a debtor to determine a debtor's risk factor. *Id*. at 698. Based on the Debtor's past expenses and defaults, the Court must increase the interest rate due to the Debtors' default risk. Pursuant to Rules 201(b) and 201(d) of the Federal Rules of Evidence, which are made applicable to this proceeding by Rule 9017 of Federal Rules of Bankruptcy Procedure, Chase requests that the Court take judicial notice of the Debtor's prior defaults under the Note and those listed in the Claims Register, and the Debtor's liabilities listed in its Bankruptcy Schedules and Statements. Based on the foregoing, this Court should add no less than 2% to the prime rate due to the Debtor's default risk.

### 3.     The Risks Associated with the Security

As stated in *Fowler*, the bankruptcy court should factor both the debtor's risk of a default and the nature of the security when establishing the appropriate cramdown interest rate. Courts recognize that there is heightened risk associated with investment properties that are non-owner occupied. *Id*. In the present case, the Property is allegedly a rental property. As a consequence, assuming the Property is a legitimate investment property, the Court should adjust the interest rate 1% as a result of the inherent risk associated with the nature of the Property. In addition, the Debtor is seeking to cramdown the value of Chase's loan to the fair market value of the Property thereby creating a modified loan that is 100% loan to value. As there will be no equity cushion to absorb any decline in the value of the Property, the Court should adjust the interest rate 1% to account for this risk. In sum, using the formula approach as set forth in *Fowler* and *Till*, the court must conclude that Chase must be paid no less than **7.25%** (3.25% + 4% for risk adjustments) fixed interest per annum on its secured claim on a fully amortizing loan (not a stepped-up rate). Accordingly, the Court must deny confirmation of the Debtor's Plan or, in the alternative, require the Debtor to amend the Plan to remedy the above-referenced defects.[5]

/././

/././

/././

---

[5] Chase did not believe an expert witness regarding interest rates was necessary at this stage in the proceedings as the evidence it used to support its proposed interest rate is based on the risk factors made part of the court's record by the Debtor's bankruptcy filings and the holding in In re Till. Chase reserves its right to resolve the interest rate at an evidentiary hearing after appropriate expert testimony.

**D.  THE DEBTOR'S ATTEMPT TO AMORTIZE THE SECURED CLAIM OVER 40 YEARS IS NOT FAIR AN EQUITABLE AS REQUIRED UNDER 11 U.S.C. §1129(b)**

Under 1129(b)(2)(A), in order for a plan to be fair and equitable with respect to a class of creditors, it must provide: (1) that the creditor's lien secured by the subject property remain intact; (2) that each holder of a claim receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim; and (3) for the class of secured claims to realize the indubitable equivalent of such claims.

A court must consider the entire plan in the context of the rights of the creditors under state law and the particular facts and circumstances when determining whether a plan is "fair and equitable." *In re D & F Construction Inc.*, 865 F.2d 673, 675 (5th Cir. 1989). Section 1129(b) requires that the dissenting claimant receive full payment over a reasonable period of time. *In re Hollanger*, 15 B.R. 35, 47 (Bankr. W.D. La. 1981) (noting that "it is clear the Bankruptcy Code allows the restructuring of debts through extensions only on a reasonable basis") The court in *In re Mulnix*, 54 B.R. 481 (Bankr. N.D. Iowa 1985) indicated that a court should look to the terms a debtor would be entitled to on the free market for a similar transaction to determine reasonable repayment terms for similar loans.

Here, the Debtor proposes to restructure the Subject Loan through an unreasonable term extension. In the present lending market, only a borrower with exceptional credit history with minimal risk factors would qualify for a forty (40) year amortization with a fixed interest rate. As such, it would be unfair and inequitable to allow the debt to be restructured with a new forty (40) year extension, a loan term never contemplated between the parties. Even if the Debtor is permitted to amortize over an extended period of time, the court must look to the market to determine reasonable repayment terms for similar loans. Accordingly, the Court must deny confirmation of the Debtor's Plan or, in the alternative, require the Debtor to amend the Plan to remedy the above referenced defects.[6]

/././

/././

---

[6] Chase did not believe an expert witness regarding a fair loan term was necessary at this stage in the proceedings Chase reserves its right to resolve the loan term at an evidentiary hearing after appropriate expert testimony.

### E. THE DEBTOR'S TREATMENT OF TAXES AND INSURANCE ON THE PROPERTY POST-CONFIRMATION IS CONTRADICTORY

In the present case, the Debtor's Plan fails to address the payment of real property taxes and real property hazard insurance on the Property post-confirmation. Although the Plan states that the "property taxes and insurance of the property will be included" in the payments, the Plan goes on to state that the "property taxes, insurance, and other expenses of the property will be paid direct by Debtor." (*See* Plan, Pages 5-6). Further, the amount of the payment listed in the Plan appears to only include interest and is insufficient to cover taxes and insurance. Accordingly, the treatment of escrow in the Plan is contradictory. Moreover, it is unclear if the Debtor will have sufficient monthly income to make additional escrow payments to Chase. Accordingly, the Court must deny confirmation of the Debtor's Plan or, in the alternative, require the Debtor to amend the Plan to remedy the above referenced defects.

### F. THE DEBTOR'S PLAN PROVIDES FOR AN INADEQUATE MEANS OF IMPLEMENTATION AND IS NOT PROPOSED IN GOOD FAITH

Title 11 U.S.C. §1129(a)(3) requires that a Chapter 11 Plan be proposed in good faith and not by any means forbidden by law. Good faith requires that a Plan achieve a result consistent with the objectives and purposes of the Code and the fundamental fairness in dealing with one's creditors. *In re Stolrow's Inc.*, 84 B.R. 167, 172 (B.A.P. 9th Cir. 1988); *In re Jorgensen*, 66 B.R. 104, 109 (B.A.P. 9th Cir. 1986). Title 11 U.S.C. §1123(a) states that a Plan shall provide adequate means for its implementation. The absence of an adequate means of implementation demonstrates a lack of good faith under Section 1129(a)(3), thereby precluding confirmation of a Chapter 11 Plan. *In re Walker*, 165 B.R. 994, 1003 (Bankr. E.D. Va. 1994). Debtor must have more than visionary promises and willingness, Debtor must demonstrate concrete evidence of a sufficient cash flow to fund and maintain both his operations and obligations under a proposed Chapter 11 Plan. *See S&P, Inc. v. Pfeifer*, 189 B.R. 173, 183 (N.D. Ind. 1995) (quoting *In re SM 104 Ltd.*, 160 B.R. 202, 234 (S.D. Fla.1993)).

Retaining property that is not producing net income is evidence of bad faith and such a plan

should not be confirmed. *See In re Lindsey*, 122 B.R. 157 (Bankr. M.D. Fla. 1991) ("[T]he court may not and should not permit the debtors to use a [plan] to retain and increase their equity in investment property at the expense of their unsecured creditors."); *see also Loop Corp. v. United States Trustee*, 379 F.3d 511, 515-16 (8th Cir. 2004) (properties must generate positive cash flow to justify retention; negative cash flow alone is cause to dismiss or convert under § 1112(b)).

In the present case, the Disclosure Statement indicates that the Debtor filed for bankruptcy protection shortly after the scheduling of a foreclosure sale of the Property. (*See* Disclosure Statement, Page 21). With respect to implementation of the Plan, it appears that the estate's only income is derived from rental income for the Property in the monthly sum of $8,900.00. However, the Property is currently vacant. (*See* Plan, Page 12). Further, the Disclosure Statement acknowledges that "[b]ecause the bulk of the Debtor's income resolves around rental income, loss of the current Tenant could severely threaten the feasibility of the Plan." (*See* Disclosure Statement, Page 10). The Disclosure Statement lists monthly expenses for the Property in the sum of $2,982.00 for property taxes, insurance, maintenance, gardening, pool service, home warranty, and management fees. (*See* Disclosure Statement, Page 28).

The Debtor has failed to provide any indication of how it intends on funding this Plan or how circumstances that caused the Debtor to file for bankruptcy have changed. The Plan does not address how the Debtor's cash flow has improved to allow Debtor to fund a reorganization nor does the Plan address how the Debtor will fund the Plan in the event the Debtor is unable to fill the vacancy in the Property. Indeed, even if the Debtor successfully secures a tenant for $8,900.00 per month, Chase maintains that the Property will still fail to cash flow:

| Monthly Rent | $8,900.00 |
|---|---|
| Current P&I Payment | $9,027.75 |
| Escrow Impound | $2,054.70[7] |
| Expenses | $975.00[8] |
| Total Monthly Income | $<3,157.45> |

---

[7] Amount of current Principal and Interest and Escrow Payment is reflected in the attached December 2013 escrow statement attached to the Exhibits as **Exhibit F** and incorporated herein by reference.
[8] Amount of expenses for the Property listed in Debtor's Disclosure Statement at Page 28, excluding taxes and insurance.

- 14 -

As discussed above, the court denied the Debtor's proposed valuation of the Property and adopted Chase's valuation of $2,250,000.00 at the hearing on the Debtor's Motion to Value. Accordingly, Chase's secured claim must be allowed in full. Based on the foregoing, the Property will produce a negative monthly cash flow. Accordingly, Chase asserts that the Debtor lacks sufficient income to fund all obligations under the proposed Chapter 11 Plan.

The Debtor's Plan is contingent upon the reduction or elimination of secured claims and the modification of interest rates and loan terms. However, Chase believes the Debtor's Plan proposes to reduce Chase's claim below the value of the Property in violation of Section 506(a) and proposes unreasonable loan terms while the Debtor retains a junior interest in the Property in violation of the absolute priority rule. As discussed above, the Debtor will need to increase the plan payments to Chase to provide for escrow advances. Accordingly, the Court must deny confirmation of the Debtor's Plan or, in the alternative, require the Debtor to amend the Plan to remedy the above-referenced defects.

### G. THE DEBTOR HAS FAILED TO DEMONSTRATE THAT THE CHAPTER 11 PLAN IS FEASIBLE

Pursuant to 11 U.S.C. §1129(a)(11), the Court is required to find that "confirmation is not likely to be followed by the liquidation or the need for further financial reorganization of the debtor...." The widely accepted application of this section as stated within the Second Circuit decision of *Chase Manhattan Mortgage and Realty Trust v. Bergman* (*In re Bergman*), 585 F.2d, 1171, 1179 (2nd Cir. 1978), wherein the Court stated:

Under the test of feasibility, the court "used the probability of actual performance of the provisions of the plan. Sincerity, honest, and willingness are not sufficient to make a plan feasible, and neither are visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts."

The Ninth Circuit is consistent in determining whether a Plan meets the requirements of Section 1129(a)(11), wherein it stated, "the bankruptcy court has an obligation to scrutinize the plan carefully to determine whether it offers a reasonable prospect of success and is workable." *In re*

*Pizza of Hawaii, Inc.*, 761 F.2d 1374, 1382 (9th Cir. 1985). To establish feasibility, the plan proponent must demonstrate concrete evidence of a sufficient cash flow to fund and maintain both its operations and obligations under the Plan. *S &P, Inc. v. Pfeifer*, 189 B.R. 173, 183 (N.D. 1995) (quoting *In re SM 104 Ltd.*, 160 B.R. 202, 234 (Bankr. S.D. Fla. 1993)).

As previously discussed, the Debtor's Plan does not provide any indication of how it intends on funding the Plan. Instead the Debtor simply states that the Plan will be funded from nonexistent rental income. The Plan's means for implementation severely fail to provide any strategy or objective information that would suggest this will be a successful reorganization. Instead, the Plan lists procedural and administrative mechanisms that provide no insight whatsoever as to feasibility. Accordingly, the Court must deny approval of the Debtor's Disclosure Statement and confirmation of the Debtor's Plan or, in the alternative, require the Debtor to amend the Plan to remedy the above-referenced defects.

**H.     THE PLAN'S TREATMENT OF CHASE'S SECURED AND UNSECURED CLAIMS IS NOT FAIR AN EQUITABLE AS REQUIRED UNDER 11 U.S.C. §1129(b)**

Pursuant to 11 U.S.C. §1129(b)(2)(B) a plan is fair and equitable with respect to a class of unsecured creditors if they are paid in full or no junior class retains any interest in estate property except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14). This provision is commonly known as the absolute priority rule. Recently, a **clear majority** of courts, including many courts in the Ninth Circuit, have affirmatively held that the absolute priority rule applies to individual Chapter 11 cases, adopting the "narrow view" of the rule. *See In re Maharaj*, 681 F.3d 558 (4th Cir. 2012); *In re Arnold*, 471 B.R. 578 (Bankr. C.D. Cal. 2012); *In re Tucker,* 2011 WL 5926757 (Bankr. D. Or. 2011); *In re Borton,* 2011 WL 5439285 (Bankr. D. Idaho 2011); *In re Lindsey,* 453 B.R. 886 (Bankr. E.D. Tenn. 2011); *In re Kamell,* 451 B.R. 505 (Bankr. C.D. Cal. 2011); *In re Draiman,* 450 B.R. 777 (Bankr. N.D. Ill. 2011); *In re Walsh,* 447 B.R. 45 (Bankr. D. Mass. 2011); *In re Stephens,* 445 B.R. 816 (Bankr. S.D. Tex. 2011); *In re Karlovich,* 456 B.R. 677 (Bankr. S.D. Cal. 2010); *In re Steedley,* 2010 WL 3528599 (Bankr. S.D. Ga. 2010); *In re Gelin,* 437 B.R. 435 (Bankr. M.D. Fla. 2010); *In re Mullins,* 435 B.R. 352 (Bankr. W.D. Va. 2010); *In re*

1 | *Gbadebo,* 431 B.R. 222 (Bankr. N.D. Cal. 2010); *but see, e.g.*, *In re Friedman*, 466, B.R. 471 (9th Cir. BAP 2012); *In re Shat*, 424 B.R. 854 (Bankr. D. Nev. 2010).

In this case, Chase's security interest in the Property is senior to the Debtor's interest in the Property. The Plan does not provide for Chase's unsecured claim in full, but the Debtor attempts to retain an interest in the Property as junior class members in violation of the absolute priority rule. Therefore, the Plan is in violation of the absolute priority rule and the Plan cannot be confirmed.

**WHEREFORE**, Chase respectfully requests:

1. That confirmation of the Plan be denied; and
2. For such other and further relief as this court deems just and proper.

Respectfully submitted,

PITE DUNCAN, LLP

Dated: January 22, 2014

/s/ *Gregory P. Campbell* (CA SBN 281732)
GREGORY P. CAMPBELL
Attorneys for Creditor, JPMorgan Chase Bank, N.A.