1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**C. Anthony Hughes SBN: 250998**
Hughes Financial Law
1395 Garden Highway, Suite 150
Sacramento, CA 95833
Ph:  (916) 485-1111
Fax: (916) 720-0255
E-mail: attorney@4851111.com

Attorney for Debtor

## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF CALIFORNIA
### SACRAMENTO DIVISION

In re:

**6056 SYCAMORE TERRACE LLC**


DEBTOR

) Case No.: 2013-34541
) Chapter 11
) DCN:  CAH-009
)
) **EXHIBIT IN SUPPORT OF THE MOTION**
) **TO VALUE THE ALLOWED SECURED**
) **CLAIM OF J P MORGAN CHASE BANK,**
) **N.A., AGAINST THE REAL PROPERTY**
) **LOCATED AT 6056 SYCAMORE**
) **TERRACE, PLEASANTON, CA  94566**
)
) Date:    March 17, 2014
) Time:    10:00 a.m.
) Place:    501 "I" Street
)              Courtroom 28, Dept. A
)              Sacramento, CA
)
) Judge:  Honorable Michael S. McManus
)

| Exhibit | Description | No. of Pages |
|---------|-------------|--------------|
| A | Deed of Trust | 22 |
| B | Appraisal Report | 40 |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT A


Case 13-34541    Filed 02/07/14    Doc 89

Recording Requested By:

WASHINGTON MUTUAL BANK    FA
FTC 102-29477-DY
Return To:

WASHINGTON MUTUAL BANK    FA
2210 ENTERPRISE DR
FLORENCE, SC 29501
DOC OPS M/S FSCE 440



2007360881    10/16/2007 08:30 AM
OFFICIAL RECORDS OF ALAMEDA COUNTY
PATRICK O'CONNELL
RECORDING FEE:    73.00

22  PGS

Prepared By:
SUE JACKSON

—————————— [Space Above This Line For Recording Data] ——————————

ZCA1
M69

# DEED OF TRUST

2-202

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

**(A) "Security Instrument"** means this document, which is dated OCTOBER 05, 2007 , together with all Riders to this document.

**(B) "Borrower"** is HOSSEIN F BOZORGZAD, A SINGLE MAN

Borrower's address is 6056 SYCAMORE TERRACE, PLEASANTON, CA 94566
. Borrower is the trustor under this Security Instrument.

**(C) "Lender"** is WASHINGTON MUTUAL BANK, FA

Lender is a FEDERAL SAVINGS BANK
organized and existing under the laws of THE UNITED STATES OF AMERICA

CALIFORNIA — Single Family — Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3005 1/01

VMP®—6(CA) (0207)

Page 1 of 15    Initials: [initials]

VMP MORTGAGE FORMS — (800)521-7291

Lender's address is **2273 N. GREEN VALLEY PARKWAY, SUITE 14, HENDERSON, NV 89014**
Lender is the beneficiary under this Security Instrument.
**(D) "Trustee"** is **CALIFORNIA RECONVEYANCE COMPANY, A CALIFORNIA CORP**

**(E) "Note"** means the promissory note signed by Borrower and dated **OCTOBER 05, 2007**
The Note states that Borrower owes Lender **ONE MILLION EIGHT HUNDRED FIFTEEN THOUSAND AND 00/100** Dollars
(U.S. $ **1,815,000.00** ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than **NOVEMBER 01, 2037**
**(F) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(H) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower (check box as applicable):

[x] Adjustable Rate Rider  [ ] Condominium Rider  [ ] Second Home Rider
[ ] Balloon Rider  [ ] Planned Unit Development Rider  [ ] Other(s) [specify]
[ ] 1-4 Family Rider  [ ] Biweekly Payment Rider

**(I) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(J) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(K) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(L) "Escrow Items"** means those items that are described in Section 3.
**(M) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(N) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(O) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(P) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and

restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the COUNTY                                           of   ALAMEDA                                    :
          [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]
          THE LEGAL DESCRIPTION IS ATTACHED HERETO AS A SEPARATE EXHIBIT
          AND IS MADE A PART HEREOF.

Parcel ID Number:   948-0017-015                    which currently has the address of
6066 SYCAMORE TERRACE                                                    [Street]
PLEASANTON                                        [City],  California  94566    [Zip Code]
("Property Address"):

     TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

     BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

     THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

     UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

     1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the

Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the

term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee and Borrower further agrees to generally assign rights to insurance proceeds to the holder of the Note up to the amount of the outstanding loan balance.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

**(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.**

**(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.**

**11. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or

loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to

make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred

-6(CA) (0207)                    Page 11 of 15            Initials:            Form 3005 1/01

in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual

knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall execute or cause Trustee to execute a written notice of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall cause this notice to be recorded in each county in which any part of the Property is located. Lender or Trustee shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. Trustee shall give public notice of sale to the persons and in the manner prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Reconveyance. Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to reconvey the Property and shall surrender this Security Instrument and all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall reconvey the Property without warranty to the person or persons legally entitled to it. Lender may charge such person or persons a reasonable fee for reconveying the Property, but only if the fee is paid to a third party (such as the Trustee) for services rendered and the charging of the fee is permitted under Applicable Law. If the fee charged does not exceed the fee set by Applicable Law, the fee is conclusively presumed to be reasonable.

24. Substitute Trustee. Lender, at its option, may from time to time appoint a successor trustee to any Trustee appointed hereunder by an instrument executed and acknowledged by Lender and recorded in the office of the Recorder of the county in which the Property is located. The instrument shall contain the name of the original Lender, Trustee and Borrower, the book and page where this Security Instrument is recorded and the name and address of the successor trustee.

ZCA2

Without conveyance of the Property, the successor trustee shall succeed to all the title, powers and duties conferred upon the Trustee herein and by Applicable Law. This procedure for substitution of trustee shall govern to the exclusion of all other provisions for substitution.

25. **Statement of Obligation Fee.** Lender may collect a fee not to exceed the maximum amount permitted by Applicable Law for furnishing the statement of obligation as provided by Section 2943 of the Civil Code of California.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____          _____ (Seal)
                                                                       -Borrower
                                          HOSSEIN F BOZORGZAD

_____          _____ (Seal)
                                                                       -Borrower

_____ (Seal)            _____ (Seal)
                   -Borrower                                           -Borrower

_____ (Seal)            _____ (Seal)
                   -Borrower                                           -Borrower

_____ (Seal)            _____ (Seal)
                   -Borrower                                           -Borrower

**State of California**
**County of** ALAMEDA

} ss.

On October 7, 2007

HOSSEIN F BOZORGZAD

before me, Heather Hollfelder Notary Public
personally appeared

~~personally known to me~~ (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s) or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal.

Heather Hollfelder                    (Seal)



HEATHER HOLLFELDER
Commission # 1538488
Notary Public - California
Alameda County
My Comm. Expires Dec 25, 2008

HEATHER HOLLFELDER
COMMISSION #1538488
NOTARY PUBLIC — CALIFORNIA
ALAMEDA COUNTY
MY COMM. EXPIRES DEC. 25, 2008

-6(CA) (0207)          Page 15 of 15          Initials:          Form 3005 1/01

102-29477

# EXHIBIT "A"

THE LAND DESCRIBED HEREIN IS SITUATED IN THE STATE OF CALIFORNIA, COUNTY OF ALAMEDA, CITY OF PLEASANTON, AND IS DESCRIBED AS FOLLOWS:

PARCEL ONE:

PARCEL 4, PARCEL MAP 7534, FILED AUGUST 31, 2000, MAP BOOK 252, PAGE 79, ALAMEDA COUNTY RECORDS.

PARCEL TWO:

A NON-EXCLUSIVE EASEMENT FOR PRIVATE ACCESS AND INCIDENTS THERETO, OVER, UNDER, ALONG AND THROUGH THOSE AREAS OF PARCEL 3 AND 4 OF SAID PARCEL MAP 7534 SHOWN AS "PAE", FOR THE BENEFIT OF PARCEL ONE ABOVE.

PARCEL THREE:

A PRIVATE ACCESS EASEMENT (P.A.E.) GRANTED IN THE DEED TO HOSSEIN F. BOZORGZAD, ET UX, RECORDED AUGUST 14, 2000, SERIES NO. 2000-241187, OVER AND ALONG A STRIP OF LAND DESCRIBED AS FOLLOWS:

PORTION OF LOT 1, AS SAID LOT IS SHOWN ON THE MAP OF THE PLEASANTON TRACT, FILED JANUARY 21, 1919, MAP BOOK 16, PAGE 72, ALAMEDA COUNTY RECORDS, DESCRIBED AS FOLLOWS:

COMMENCING AT A POINT ON THE NORTH LINE OF SAID LOT 1, SAID POINT ALSO BEING THE NORTHEAST CORNER OF THAT PARCEL OF LAND DESCRIBED IN THE CORRECTION GRANT DEED TO EARL E. BACH JR., A SINGLE MAN RECORDED JULY 17, 2000, SERIES NO. 2000-210713 OFFICIAL RECORDS OF ALAMEDA COUNTY; THENCE SOUTH 00 DEGREES 08 MINUTES 01 SECONDS WEST (THE BEARING OF THE EASTERLY LINE OF SAID BACH DEED BEING TAKEN AS SOUTH 00 DEGREES 08 MINUTES 01 SECONDS WEST FOR THE PURPOSES OF THIS DESCRIPTION) 206.43 FEET, TO THE POINT OF BEGINNING; THENCE CONTINUING SOUTH 00 DEGREES 08 MINUTES 01 SECONDS WEST 377.07 FEET MORE OR LESS TO THE NORTHERLY LINE OF PARCEL OF LAND DESCRIBED IN THE DEED TO THE CITY OF PLEASANTON, RECORDED MARCH 26, 1999, SERIES NO. 99-130272, SAID POINT ALSO BEING THE BEGINNING OF A NON-TANGENT CURVE CONCAVE TO THE NORTH

HAVING A RADIUS OF 423.00 FEET, A RADIAL LINE THROUGH SAID BEGINNING BEARS SOUTH 22 DEGREES 13 MINUTES 59 SECONDS EAST; THENCE SOUTHWESTERLY 790 FEET ALONG THE ARC OF SAID CURVE THROUGH A CENTRAL ANGLE OF 1 DEGREES 04 MINUTES 12 SECONDS; THENCE NORTH 00 DEGREES 08 MINUTES 01 SECONDS EAST 205.94 FEET TO THE BEGINNING OF A CURVE CONCAVE TO THE WEST HAVING A RADIUS OF 158.00 FEET; THENCE NORTHERLY 25.01 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 9 DEGREES 04 MINUTES 07 SECONDS TO THE BEGINNING OF A REVERSE CURVE CONCAVE TO THE EAST HAVING A RADIUS OF 162.00 FEET, A RADIAL LINE THROUGH SAID BEGINNING OF REVERSE CURVE BEARS NORTH 81 DEGREES 03 MINUTES 54 SECONDS EAST, THENCE NORTHERLY 25.64 FEET ALONG SAID CURVE THROUGH A CENTRAL ANGLE OF 9 DEGREES 04 MINUTES 07 SECONDS; THENCE NORTH 00 DEGREES 08 MINUTES 01 SECONDS EAST 123.64 FEET, THENCE SOUTH 89 DEGREES 51 MINUTES 59 SECONDS EAST 11.33 FEET, MORE OR LESS, TO THE POINT OF BEGINNING.

A.P.N.: 948-0017-015

RMTA
M69

# ADJUSTABLE RATE RIDER
### (12-MTA Index - Payment and Rate Caps)

2-202

THIS ADJUSTABLE RATE RIDER is made this <u>5TH</u> day of <u>OCTOBER, 2007</u>, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to <u>WASHINGTON MUTUAL BANK, FA</u> (the "Lender") of the same date and covering the property described in the Security Instrument and located at:

<u>6056 SYCAMORE TERRACE, PLEASANTON, CA  94566</u>
(PROPERTY ADDRESS)

**THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN <u>115%</u> OF THE ORIGINAL AMOUNT (OR $<u>2,087,250.00</u>). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.**

**ADDITIONAL COVENANTS.** In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

## A.  INTEREST RATE AND MONTHLY PAYMENT CHANGES
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. Up until the first day of the calendar month that precedes the first payment due date set forth in Section 3 of the Note, I will pay interest at a yearly rate of <u>7.513</u>%. Thereafter, until the first Change Date (as defined in Section 4 of this Note) I will pay interest at a yearly rate of <u>7.513</u>%.The interest rate I will pay will thereafter change in accordance with Section 4 of the Note.

## 4.  INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Change Dates

The interest rate I will pay may further change on the ___1ST___ day of __DECEMBER, 2007_____, and on that day every month thereafter. Each such day is called a "Change Date".

### (B) The Index

On each Change Date, my interest rate will be based on an Index. The "Index" is the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (H.15)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12.

The most recent Index figure available as of 15 days before each interest rate Change Date is called the "Current Index". If the Index is no longer available, the Note Holder will choose a new index which is based upon comparable information. The Note Holder will give me notice of this choice.

### (C) Calculation of Changes

Before each Change Date, the Note Holder will calculate my new interest rate by adding __TWO AND 65/100_____ percentage points __2.650___% ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. The new Margin will be the difference between the average of the old Index for the most recent three year period which ends on the last date the Index was available plus the Margin on the last date the old Index was available and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). This difference will be rounded to the next higher 1/8 of 1%.

### (D) Interest Rate Limit

My interest rate will never be greater than __NINE AND 95/100_____ percentage points __9.950__% ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

### (E) Payment Change Dates

Effective every year commencing __DECEMBER 01, 2008_____, and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine

2-202

the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the Maturity Date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my minimum monthly payment, subject to Section 4(F) below, and I will make payments in the new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F) Monthly Payment Limitations**

Unless Section 4(H) and 4(I) below apply, the amount of my new minimum monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying. This payment cap applies only to the principal payment and does not apply to any escrow payments Lender may require under the Security Instrument.

**(G)  Changes in My Unpaid Principal Due to Negative Amortization or Accelerated Amortization**

Since my initial minimum monthly payment may not be based on the interest rate set forth in Section 2 of this Note, since the minimum monthly payment amount changes less frequently than the interest rate and since the minimum monthly payment is subject to the payment limitations described in Section 4(F), my minimum monthly payment could be less than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the minimum monthly payment is less than the interest portion and I choose to make only the minimum monthly payment, the Note Holder will subtract the minimum monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that my minimum monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

**(H) Limit on My Unpaid Principal; Increased Minimum Monthly Payment**

My unpaid principal can never exceed a maximum amount equal to ____115%____ of the principal amount originally borrowed. In the event my unpaid Principal would otherwise exceed that ___115%___ limitation, I will begin paying a new minimum monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new minimum monthly payment will be an amount which would be sufficient to repay my then unpaid Principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

**(I) Required Full Monthly Payment**

On the ___FIFTH___ anniversary of the due date of the first monthly payment, and on that same day every ___FIFTH___ year thereafter, my minimum monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

**(J) Notice of Changes**

The Note Holder will deliver or mail to me a notice of any changes in  the amount of my minimum

32843 (05-07)                                   Page 3 of 5                                   LRD02USC (Version 2.0)

monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B.  TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument is amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser. If all or any part of the Property or any interest in the Property is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (c) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (d) payment of Assumption Fee if requested by Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

RMT2                                                               2-202

    BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute any document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

HOSSEIN F BOZORGZAD

HOSSEIN F. BOZORGZAD

_____

_____

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT B

**ARM'S REPORT**

File No. SYCAMORE6056

APPRAISAL OF



SINGLE FAMILY RESIDENCE

LOCATED AT:

6056 SYCAMORE TERRACE
PLEASANTON, CA  94566

FOR:

6056 SYCAMORE LLC
2730 VISTA ROBLE DR.
AUBURN, CA 95603

BORROWER:

6056 SYCAMORE LLC

AS OF:

January 23, 2014

BY:

ANTONIO R. MERCADO
AL031781

ARM'S REPORT

# Uniform Residential Appraisal Report

File No. SYCAMORE6056

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | | | |
|---|---|---|---|
| Property Address 6056 SYCAMORE TERRACE | City PLEASANTON | State CA | ZipCode 94566 |

Borrower 6056 SYCAMORE LLC    Owner of Public Record 6056 SYCAMORE LLC    County ALAMEDA

Legal Description SEE TITLE REPORT

Assessor's Parcel # 948-0017-015-01    Tax Year 2013    R.E. Taxes $ 19,918

Neighborhood Name    Map Reference 714-D6    Census Tract 4507.01 / 3

Occupant [ ] Owner [ ] Tenant [X] Vacant    Special Assessments $ 0    [ ] PUD    HOA $ 0    [ ] per year [ ] per month

Property Rights Appraised [X] Fee Simple [ ] Leasehold [ ] Other (describe)

Assignment Type [ ] Purchase Transaction [ ] Refinance Transaction [X] Other (describe) MARKET VALUE

Lender/Client 6056 SYCAMORE LLC    Address 2730 VISTA ROBLE DR., AUBURN, CA 95603

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? [ ] Yes [X] No

Report data source(s) used, offering price(s), and date(s) PRO MLS LISTINGS / REALQUEST

I [ ] did [ ] did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $    Date of Contract    Is the property seller the owner of public record? [ ] Yes [ ] No    Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? [ ] Yes [ ] No

If Yes, report the total dollar amount and describe the items to be paid.

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | Property Values | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Location [ ] Urban [X] Suburban [ ] Rural | | | Property Values [ ] Increasing [X] Stable [ ] Declining | | | PRICE $(000) | AGE (yrs) | | One-Unit | 85 % | | |
| Built-Up [X] Over 75% [ ] 25-75% [ ] Under 25% | | | Demand/Supply [ ] Shortage [X] In Balance [ ] Over Supply | | | 1,700 Low | 10 | | 2-4 Unit | | % | |
| Growth [ ] Rapid [X] Stable [ ] Slow | | | Marketing Time [ ] Under 3 mths [X] 3-6 mths [ ] Over 6 mths | | | 2,300 High | 20 | | Multi-Family | 10 % | | |
| | | | | | | 1,920 Pred. | 15 | | Commercial | 5 % | | |
| | | | | | | | | | Other | % | | |

Neighborhood Boundaries  See Attached Addendum

Neighborhood Description  See Attached Addendum

Market Conditions (including support for the above conclusions)  See Attached Addendum

| | | | | | |
|---|---|---|---|---|---|
| Dimensions SEE PLAT MAP | Area 35141 sf | Shape REGULAR | View B;Mtn; | | |

Specific Zoning Classification R1    Zoning Description RESIDENTIAL SINGLE FAMILY

Zoning Compliance [X] Legal [ ] Legal Nonconforming (Grandfathered Use) [ ] No Zoning [ ] Illegal (describe)

Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No    If No, describe.

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | | Street ASPHALT | [X] | |
| Gas | [X] | | Sanitary Sewer | [X] | | Alley NONE | | |

FEMA Special Flood Hazard Area [ ] Yes [X] No    FEMA Flood Zone X    FEMA Map # 060012-0319G    FEMA Map Date 08/03/2009

Are the utilities and off-site improvements typical for the market area? [X] Yes [ ] No    If No, describe.

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? [ ] Yes [X] No    If Yes, describe.

| GENERAL DESCRIPTION | FOUNDATION | | EXTERIOR DESCRIPTION materials/condition | INTERIOR materials/condition | |
|---|---|---|---|---|---|
| Units [X] One [ ] One with Accessory Unit | [ ] Concrete Slab [X] Crawl Space | | Foundation Walls CONC./AVG | Floors GARBLE/CARPET/AVG | |
| # of Stories 2 | [ ] Full Basement [ ] Partial Basement | | Exterior Walls STUCCO/AVG | Walls DRYWALL/AVG. | |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | Basement Area 0 sq. ft. | | Roof Surface CERAMIC TILE/AVG | Trim/Finish WOOD/AVG. | |
| [X] Existing [ ] Proposed [ ] Under Const. | Basement Finish 0 % | | Gutters & Downspouts G.I./AVG | Bath Floor CERA TL/AVG. | |
| Design (Style) MEDITERRANEAN | [ ] Outside Entry/Exit [ ] Sump Pump | | Window Type DUAL PANE/AVG | Bath Wainscot MARBLE/AVG | |
| Year Built 2001 | Evidence of [ ] Infestation | | Storm Sash/Insulated NONE | Car Storage [ ] None | |
| Effective Age (Yrs) 10 | [ ] Dampness [ ] Settlement | | Screens YES/AVG | [X] Driveway # of Cars 4 | |
| Attic [X] None | Heating [X] FWA [ ] HWBB [ ] Radiant | Amenities | WoodStove(s) #0 | Driveway Surface CONCRETE | |
| [ ] Drop Stair [ ] Stairs | [ ] Other Fuel GAS | [X] Fireplace(s) # 5 | [X] Fence WOOD | [X] Garage # of Cars 4 | |
| [ ] Floor [ ] Scuttle | Cooling [X] Central Air Conditioning | [X] Patio/Deck conc | [X] Porch CONC. | [ ] Carport # of Cars 0 | |
| [ ] Finished [ ] Heated | [ ] Individual [ ] Other | [X] Pool IN GROUND | [X] Other BALCONY | Att. [X] Det. [ ] Built-in | |
| Appliances [X] Refrigerator [X] Range/Oven [X] Dishwasher [X] Microwave [ ] Washer/Dryer [ ] Other (describe) FAN/HOOD | | | | | |

Finished area above grade contains:    11 Rooms    4 Bedrooms    5.1 Bath(s)    5,353 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.).  DUAL PANE WINDOWS AND DOORS

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).  C2;No updates in the prior 15 years;THE SUBJECT IS IN AVERAGE CONDITION OVERALL. THERE ARE NO FUNCTIONAL OR ECONOMIC OBSOLESCENCE NOTED. NO REPAIRS ARE NEEDED. MARBLE FLOOR ON ENTRY TO DINING ROOM. CARPET IN THE LIVING ROOM, FAMILY ROOM HALLWAYS AND BEDROOM. KITCHEN WITH BUILT-IN APPLIANCES, GRANITE COUNTER TOP, CUSTOM BUILT-IN CABINETS AND STAINLESS STEEL FINISHED APPLIANCES. BATHROOM WITH CERAMIC TILE FLOOR AND MARBLE WAINSCOT. ALL MAJOR UTILITY SYSTEMS WERE IN WORKING CONDITION < continued in addendum >

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? [ ] Yes [X] No    If Yes, describe.  N/A

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? [X] Yes [ ] No    If No, describe.  THE SUBJECT CONFORMS TO THE NEIGHBORHOOD IN FUNCTIONAL, UTILITY, USE AND CONDITION.

# Uniform Residential Appraisal Report

File No. SYCAMORE6056

There are 10 comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 1,900,000 to $ 2,799,000

There are 57 comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 1,425,000 to $ 2,600,000

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | | COMPARABLE SALE NO. 2 | | COMPARABLE SALE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 6056 SYCAMORE TERRACE PLEASANTON, CA 94566 | 1037 SUNSET CREEK LANE PLEASANTON, CA 94566 | | 1185 LAGUNA CREEK LANE PLEASANTON, CA 94566 | | 5693 ELLIS COURT PLEASANTON, CA 94566 | |
| Proximity to Subject | | 0.45 miles E | | 1.02 miles W | | 0.50 miles E | |
| Sale Price | $ | | $ 1,782,000 | | $ 1,897,500 | | $ 1,975,000 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 358.26 sq. ft. | | $ 356.07 sq. ft. | | $ 397.06 sq. ft. | |
| Data Source(s) | | BEMLS #40625412;DOM 14 | | BEMLS #40632891;DOM 1 | | BEMLS #40634829;DOM 8 | |
| Verification Source(s) | | DOC.#:252451 / REALQUEST | | DOC.#:316522 / REALQUEST | | DOC.#: 365371/ REALQUEST | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | ArmLth Conv;0 | | ArmLth Conv;0 | | ArmLth Conv;0 | |
| Date of Sale/Time | | s07/12;c06/12 | | s09/13;c09/13 | | s11/13;c10/12 | |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 35141 sf | 20213 sf | +45,000 | 16321 sf | +94,000 | 19763 sf | +46,000 |
| View | B;Mtn; | B;Mtn; | | B;Mtn; | | B;Mtn; | |
| Design (Style) | DT2;MEDITERRANEAN | DT2;MEDITERRANEAN | | DT2;MEDITERRANEAN | | DT2;MEDITERRANEAN | |
| Quality of Construction | Q2 | Q2 | | Q2 | | Q2 | |
| Actual Age | 13 | 9 | 0 | 10 | 0 | 9 | 0 |
| Condition | C2 | C2 | | C2 | | C2 | |
| Above Grade Room Count (Total / Bdrms / Baths) | 11 / 4 / 5.1 | 10 / 4 / 5.1 | 0 | 13 / 5 / 5.1 | -30,000 | 11 / 4 / 5.1 | 0 |
| Gross Living Area 200 | 5,353 sq. ft. | 4,974 sq. ft. | 76,000 | 5,329 sq. ft. | 0 | 4,974 sq. ft. | 76,000 |
| Basement & Finished Rooms Below Grade | 0sf | 0sf | | 0sf | | 0sf | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | FWA C/Air | FWA C/Air | | FWA C/Air | | FWA C/Air | |
| Energy Efficient Items | NONE | NONE | | NONE | | NONE | |
| Garage/Carport | 4ga | 3ga | +3,000 | 3ga | +3,000 | 3ga | +3,000 |
| Porch/Patio/Deck | PORCH/PATIO | PORCH/PATIO | | PORCH/PATIO | | PORCH/DECK | 0 |
| FIREPLACE | 5 F/P | 2 F/P | +7,500 | 2 F/P | +7,500 | 3 F/P | +5,000 |
| POOL | POOL/SPA | POOL/SPA | | POOL/SPA | | NONE | +20,000 |
| KITCH. EQUIP. | BUILT-INS | BUILT-INS | | BUILT-INS | | BUILT-INS | |
| Net Adjustment (Total) | | [X] + [ ] - | $ 131,500 | [X] + [ ] - | $ 74,500 | [X] + [ ] - | $ 150,000 |
| Adjusted Sale Price of Comparables | | Net Adj. 7.4% Gross Adj. 7.4% | $ 1,913,500 | Net Adj. 3.9% Gross Adj. 7.1% | $ 1,972,000 | Net Adj. 7.6% Gross Adj. 7.6% | $ 2,125,000 |

I [X] did [ ] did not research the sale or transfer history of the subject property and comparable sales. If not, explain N/A

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Data source(s) REALQUEST

My research [ ] did [X] did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.

Data source(s) REALQUEST

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE NO. 1 | COMPARABLE SALE NO. 2 | COMPARABLE SALE NO. 3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 05/18/2012 | 10/07/2005 | 05/25/2007 | 08/23/2005 |
| Price of Prior Sale/Transfer | $0 | $2,090,500 | $1,850,000 | $1,936,500 |
| Data Source(s) | REALQUEST | REALQUEST | REALQUEST | REALQUEST |
| Effective Date of Data Source(s) | 01/23/2014 | 01/23/2014 | 01/23/2014 | 01/23/2014 |

Analysis of prior sale or transfer history of the subject property and comparable sales See Attached Addendum

Summary of Sales Comparison Approach. See Attached Addendum

Indicated Value by Sales Comparison Approach $ 1,920,000 ONE MILLION NINE HUNDRED TWENTY THOUSAND DOLLARS

## RECONCILIATION

Indicated Value by: Sales Comparison Approach $ 1,920,000 Cost Approach (if developed) $ 1,930,000 Income Approach (if developed) $ 0

THE SALES COMPARISON APPROACH TO VALUE WAS GIVEN MOST WEIGHT ON THIS REPORT AS THIS IS THE PRIME MOTIVATION OF THE BUYERS IN THIS MARKET. THE INCOME AND COST APPROACHES WERE NOT GIVEN ANY CONSIDERATION AS BOTH APPROACHES DOES NOT SUPPORT MARKET DECISIONS ON THIS TYPE OF PROPERTIES. THIS REPORT IS FOR THE EXCLUSIVE USE OF THE CLIENT.

This appraisal is made [X] "as is," [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or [ ] subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: N/A

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $ 1,920,000 as of 01/23/2014, which is the date of inspection and the effective date of this appraisal.

**ARM'S REPORT**

## Uniform Residential Appraisal Report

File No. SYCAMORE6056

THE UNDERSIGNED HAS PROVIDED PRIOR SERVICE FOR THE SUBJECT ON 03/24/2013. IT WAS AN APPRAISAL ORDER FROM CHASE HOME FINANCE WAMU THROUGH NATIONS VALUATION SERVICES (AMC)

CLARIFICATION OF INTENDED USE AND INTENDED USER:
THE INTENDED USER OF THIS APPRAISAL REPORT IS THE LEND/CLIENT. THE INTENDED USE IS TO EVALUATE THE PROPERTY THAT IS THE SUBJECT OF THIS APPRAISAL FOR A MORTGAGE FINANCE TRANSACTION, SUBJECT TO THE STATED SCOPE OF WORK, PURPOSE OF THE APPRAISAL, REPORTING REQUIREMENTS OF THIS APPRAISAL REPORT FORM, AND DEFINITION OF MARKET VALUE. NO ADDITIONAL INTENDED USERS ARE IDENTIFIED BY THE APPRAISER.


THE APPRAISER'S INSPECTION OF THE PROPERTY WAS LIMITED TO WHAT WAS READILY OBSERVABLE WITHOUT MOVING FURNITURE, FLOOR COVERINGS OR PERSONAL PROPERTY. UNLESS OTHERWISE STATED, THE APPRAISER DID NOT VIEW ATTICS, CRAWL SPACE OR ANY OTHER AREA THAT WOULD INVOLVE THE USE OF LADDERS OR SPECIAL EQUIPMENT. THE APPRAISER'S VIEWING OF THE PROPERTY WAS LIMITED TO SURFACE AREAS ONLY AND CAN OFTEN BE COMPROMISED BY LANDSCAPING, PLACEMENT OF PERSONAL PROPERTY OR EVEN WEATHER CONDITIONS. MOST IMPORTANTLY, THE APPRAISER'S INSPECTION OF THE PROPERTY IS FAR DIFFERENT FROM AND MUCH LESS INTENSIVE THAN THE TYPE OF INSPECTIONS PERFORMED TO DISCOVER PROPERTY DEFECTS. THE APPRAISER IS NOT A HOME INSPECTOR, BUILDING CONTRACTOR, PEST CONTROL SPECIALIST OR STRUCTURAL ENGINEER. AN APPRAISAL IS NOT A SUBSTITUTE FOR A HOME INSPECTION OR AN INSPECTION BY A QUALIFIED EXPERT IN DETERMINING ISSUES SUCH AS, BUT NOT LIMITED TO, FOUNDATION SETTLEMENT OR STABILITY, MOISTURE PROBLEMS, WOOD DESTROYING (OR OTHER) INSECTS, RODENTS OR PESTS, RADON GAS OR LEAD-BASED PAINT. THE CLIENT IS INVITED AND ENCOURAGED TO EMPLOY THE SERVICE OF APPROPRIATE EXPERTS TO ADDRESS ANY AREA OF CONCERN.


USE OF COST APPROACH FOR INSURANCE PURPOSES:
REPLACEMENT COST FIGURES USED IN DEVELOPING THE COST APPROACH ARE FOR VALUATION PURPOSES ONLY. NO ONE, CLIENT OR THIRD PARTY, SHOULD RELY ON THESE FIGURES FOR INSURANCE PURPOSES. THE DEFINITION OF "MARKET VALUE" ON PAGE FOUR OF THIS FORM IS NOT CONSISTENT WITH DEFINITIONS OF "INSURABLE VALUE." ACTUAL RECONSTRUCTION COSTS CAN EASILY EXCEED THE REPLACEMENT COST FIGURES USED IN THIS APPRAISAL.

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)   DUE TO THE LACK OF AVAILABLE VACANT LAND SALES, THE ALLOCATION METHOD WAS USE TO ESTIMATE THE SITE VALUE. OVERALL VALUE RATIO/RELATIONSHIP IS TYPICAL GENERALLY FOUND FOR THE SIMILAR PROPERTIES IN THE AREA. THIS FACT HAS NO ADVERSE EFFECT ON THE SUBJECT MARKETABILITY. COST FIGURES USED IN THIS COST APPROACH ARE FOR VALUATION PURPOSES ONLY.

| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE ............................ = $ | 1,141,000 |
|---|---|---|
| Source of cost data MARSHALL & SWIFT HANDBOOK | Dwelling     5,353 Sq. Ft. @ $   150.00 ............ = $ | 802,950 |
| Quality rating from cost service GOOD   Effective date of cost data CURRENT | Sq. Ft. @ $ ............ = $ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | INGROUND POOL | 40,000 |
| THE HIGH LAND TO IMPROVEMENTS RATIO IS TYPICAL OF | Garage/Carport 1,346   Sq. Ft. @ $   50.00 ......... = $ | 67,300 |
| PROPERTIES IN THIS AREA. COSTS WERE OBTAINED FROM | Total Estimate of Cost-New ............ = $ | 910,250 |
| MARSHALL & SWIFT HANDBOOK AND LOCAL CONTRACTORS. LAND | Less   60      Physical      Functional      External | |
| VALUE IS DERIVED EXTRACTION. DEPRECIATION DETERMINED BY | Depreciation  $151,708 | $20,000 | $0          = $ ( | 171,708) |
| THE OVERALL CONDITION OF THE UNIT AS RELATED TO NORMAL | Depreciated Cost of Improvements ............... = $ | 738,542 |
| WEAR AND TEAR AND AVERAGE CONDITION OF COMPARABLE | "As-is" Value of Site Improvements ............ = $ | 50,500 |
| RESIDENCES IN THE AREA. | | |
| Estimated Remaining Economic Life (HUD and VA only)   50 Years | INDICATED VALUE BY COST APPROACH ........... = $ | 1,930,000 |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $ | X Gross Rent Multiplier | = $ | Indicated Value by Income Approach |
|---|---|---|---|

Summary of Income Approach (including support for market rent and GRM)

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?   ☐ Yes  ☐ No   Unit type(s)   ☐ Detached  ☐ Attached
Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.
Legal name of project
Total number of phases                Total number of units                           Total number of units sold
Total number of units rented          Total number of units for sale                   Data source(s)
Was the project created by the conversion of an existing building(s) into a PUD?   ☐ Yes  ☐ No   If Yes, date of conversion.
Does the project contain any multi-dwelling units?   ☐ Yes  ☐ No   Data source(s)
Are the units, common elements, and recreation facilities complete?   ☐ Yes  ☐ No   If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?   ☐ Yes  ☐ No   If Yes, describe the rental terms and options.
Describe common elements and recreational facilities.

**ARM'S REPORT**

## Uniform Residential Appraisal Report

File No. SYCAMORE6056

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1.   The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2.   The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3.   The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4.   The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5.   The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing this appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6.   The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

**ARM'S REPORT**

## Uniform Residential Appraisal Report

File No. SYCAMORE6056

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1.   I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2.   I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3.   I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4.   I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5.   I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6.   I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7.   I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8.   I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9.   I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

21.  The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

**ARM'S REPORT**

Uniform Residential Appraisal Report                    File No. SYCAMORE6056

22.  I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations.  Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23.  The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24.  If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25.  Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

26. THE APPRAISER'S COMPANY ADDRESS IS 23.4 MILES AWAY FROM THE SUBJECT PROPERTY.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1.    I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2.    I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3.    The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4.    This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5.    If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if  a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name ANTONIO R. MERCADO | Name |
| Company Name ARM'S REPORT | Company Name |
| Company Address 2064 MCKENZIE PL., | Company Address |
| SAN JOSE, CA 95131 | |
| Telephone Number (408)439-0539 | Telephone Number |
| Email Address ginomer@gmail.com | Email Address |
| Date of Signature and Report 01/27/2014 | Date of Signature |
| Effective Date of Appraisal 01/23/2014 | State Certification # |
| State Certification # | or State License # |
| or State License # AL031781 | State |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License |
| State CA | |
| Expiration Date of Certification or License 12/12/2013 | |

ADDRESS OF PROPERTY APPRAISED
6056 SYCAMORE TERRACE
PLEASANTON, CA  94566

APPRAISED VALUE OF SUBJECT PROPERTY $ 1,920,000

LENDER/CLIENT
Name No AMC
Company Name 6056 SYCAMORE LLC
Company Address 2730 VISTA ROBLE DR.
AUBURN, CA 95603
Email Address

SUBJECT PROPERTY
☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
   Date of Inspection
☐ Did inspect interior and exterior of subject property
   Date of Inspection

COMPARABLE SALES
☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
   Date of Inspection

Freddie Mac Form 70 March 2005        UAD Version 9/2011        Produced using ACI software, 800.234.8727 www.aciweb.com        Fannie Mae Form 1004 March 2005
Page 6 of 6        1004_05UAD 12172013

ARM'S Report

**ARM'S REPORT**

## Uniform Residential Appraisal Report

File No. SYCAMORE6056

| FEATURE | SUBJECT | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
|---|---|---|---|---|---|---|---|
| | 6056 SYCAMORE TERRACE | 3785 SMALLWOOD COURT | | 2792 SPOTORNO COURT | | 1032 SYCAMORE CREEK WAY | |
| Address | PLEASANTON, CA 94566 | PLEASANTON, CA 94566 | | PLEASANTON, CA 94566 | | PLEASANTON, CA 94566 | |
| Proximity to Subject | | 1.58 miles E | | 3.13 miles E | | 0.57 miles ESE | |
| Sale Price | $ | | $ 2,270,500 | | $ 1,900,000 | | $ 2,299,950 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 391.47 sq. ft. | | $ 433.00 sq. ft. | | $ 462.39 sq. ft. | |
| Data Source(s) | | BEMLS #40607692;DOM 82 | | BEMLS #40643367;DOM 3 | | BEMLS #40642696;DOM 9 | |
| Verification Source(s) | | DOC.#:302676 / REALQUEST | | PENDING SALE | | ACTIVE LISTING | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | | ArmLth | | ArmLth | 0 | Listing | |
| Concessions | | Conv;0 | | Conv;0 | | ;0 | |
| Date of Sale/Time | | s09/13;c06/12 | | c01/14 | | Active | |
| Location | N;Res; | N;Res; | | N;Res; | | N;Res; | |
| Leasehold/Fee Simple | Fee Simple | FEE SIMPLE | | FEE SIMPLE | | FEE SIMPLE | |
| Site | 35141 sf | 26436 sf | +26,000 | 38050 sf | -9,000 | 17928 sf | +51,500 |
| View | B;Mtn; | B;CtySky; | -150,000 | B;Mtn; | | B;Mtn; | |
| Design (Style) | DT2;MEDITERRANEAN | DT2;MEDITERRANEAN | | DT2;MEDITERRANEAN | | DT2;MEDITERRANEAN | |
| Quality of Construction | Q2 | Q2 | | Q2 | | Q2 | |
| Actual Age | 13 | 15 | | 20 | 0 | 10 | 0 |
| Condition | C2 | C2 | | C2 | | C2 | |
| Above Grade | Total | Bdrms | Baths | Total | Bdrms | Baths | |
| Room Count | 11 | 4 | 5.1 | 12 | 5 | 5.1 | -30,000 | 10 | 4 | 3.1 | +60,000 | 11 | 4 | 5.1 | 0 |
| Gross Living Area 200 | 5,353 sq. ft. | 5,800 sq. ft. | -89,500 | 4,388 sq. ft. | 193,000 | 4,974 sq. ft. | 76,000 |
| Basement & Finished | 0sf | 0sf | | 0sf | | 0sf | |
| Rooms Below Grade | | | | | | | |
| Functional Utility | AVERAGE | AVERAGE | | AVERAGE | | AVERAGE | |
| Heating/Cooling | FWA C/Air | FWA C/Air | | FWA C/Air | | FWA C/Air | |
| Energy Efficient Items | NONE | NONE | | NONE | | NONE | |
| Garage/Carport | 4ga | 3ga | +3,000 | 3ga | +3,000 | 3ga | +3,000 |
| Porch/Patio/Deck | PORCH/PATIO | PORCH/PATIO | | PORCH/PATIO | | PORCH/PATIO | |
| FIREPLACE | 5 F/P | 4 F/P | +2,500 | 2 F/P | +7,500 | 3 F/P | +5,000 |
| POOL | POOL/SPA | POOL/SPA | | NONE | +20,000 | POOL/SPA | |
| KITCH. EQUIP. | BUILT-INS | BUILT-INS | | BUILT-INS | | BUILT-INS | |
| Net Adjustment (Total) | | ☐ + ☒ - | $ 238,000 | ☒ + ☐ - | $ 274,500 | ☒ + ☐ - | $ 135,500 |
| Adjusted Sale Price | | Net Adj. -10.5% | | Net Adj. 14.4% | | Net Adj. 5.9% | |
| of Comparables | | Gross Adj. 13.3% | $ 2,032,500 | Gross Adj. 15.4% | $ 2,174,500 | Gross Adj. 5.9% | $ 2,435,450 |
| ITEM | SUBJECT | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
| Date of Prior Sale/Transfer | 05/18/2012 | 05/18/1998 | | 07/30/2010 | | 12/29/2005 | |
| Price of Prior Sale/Transfer | $0 | $382,500 | | $1,638,500 | | $2,353,909 | |
| Data Source(s) | REALQUEST | REALQUEST | | REALQUEST | | REALQUEST | |
| Effective Date of Data Source(s) | 01/23/2014 | 01/23/2014 | | 01/23/2014 | | 01/23/2014 | |

Summary of Sales Comparison Approach    PLEASE. SEE SUMMARY OF SALES COMPARISON SECTION.

## Condition Ratings and Definitions

C1   The improvements have been very recently constructed and have not previously been occupied. The entire structure and all components are new and the dwelling features no physical depreciation.*

*Note: Newly constructed improvements that feature recycled materials and/or components can be considered new dwellings provided that the dwelling is placed on a 100% new foundation and the recycled materials and the recycled components have been rehabilitated/re-manufactured into like-new condition. Recently constructed improvements that have not been previously occupied are not considered "new" if they have any significant physical depreciation (i.e., newly constructed dwellings that have been vacant for an extended period of time without adequate maintenance or upkeep).

C2   The improvements feature no deferred maintenance, little or no physical depreciation, and require no repairs. Virtually all building components are new or have been recently repaired, refinished, or rehabilitated. All outdated components and finishes have been updated and/or replaced with components that meet current standards. Dwellings in this category either are almost new or have been recently completely renovated and are similar in condition to new construction.

*Note: The improvements represent a relatively new property that is well maintained with no deferred maintenance and little or no physical depreciation, or an older property that has been recently completely renovated.

C3   The improvements are well maintained and feature limited physical depreciation due to normal wear and tear. Some components, but not every major building component, may be updated or recently rehabilitated. The structure has been well maintained.

*Note: The improvement is in its first-cycle of replacing short-lived building components (appliances, floor coverings, HVAC, etc.) and is being well maintained. Its estimated effective age is less than its actual age. It also may reflect a property in which the majority of short-lived building components have been replaced but not to the level of a complete renovation.

C4   The improvements feature some minor deferred maintenance and physical deterioration due to normal wear and tear. The dwelling has been adequately maintained and requires only minimal repairs to building components/mechanical systems and cosmetic repairs. All major building components have been adequately maintained and are functionally adequate.

*Note: The estimated effective age may be close to or equal to its actual age. It reflects a property in which some of the short-lived building components have been replaced, and some short-lived building components are at or near the end of their physical life expectancy; however, they still function adequately. Most minor repairs have been addressed on an ongoing basis resulting in an adequately maintained property.

C5   The improvements feature obvious deferred maintenance and are in need of some significant repairs. Some building components need repairs, rehabilitation, or updating. The functional utility and overall livability is somewhat diminished due to condition, but the dwelling remains useable and functional as a residence.

*Note: Some significant repairs are needed to the improvements due to the lack of adequate maintenance. It reflects a property in which many of its short-lived building components are at the end of or have exceeded their physical life expectancy but remain functional.

C6   The improvements have substantial damage or deferred maintenance with deficiencies or defects that are severe enough to affect the safety, soundness, or structural integrity of the improvements. The improvements are in need of substantial repairs and rehabilitation, including many or most major components.

*Note: Substantial repairs are needed to the improvements due to the lack of adequate maintenance or property damage. It reflects a property with conditions severe enough to affect the safety, soundness, or structural integrity of the improvements.

## Quality Ratings and Definitions

Q1   Dwellings with this quality rating are usually unique structures that are individually designed by an architect for a specified user. Such residences typically are constructed from detailed architectural plans and specifications and feature an exceptionally high level of workmanship and exceptionally high-grade materials throughout the interior and exterior of the structure. The design features exceptionally high-quality exterior refinements and ornamentation, and exceptionally high-quality interior refinements. The workmanship, materials, and finishes throughout the dwelling are of exceptionally high quality.

Q2   Dwellings with this quality rating are often custom designed for construction on an individual property owner's site. However, dwellings in this quality grade are also found in high-quality tract developments featuring residences constructed from individual plans or from highly modified or upgraded plans. The design features detailed, high-quality exterior ornamentation, high-quality interior refinements, and detail. The workmanship, materials, and finishes throughout the dwelling are generally of high or very high quality.

Q3   Dwellings with this quality rating are residences of higher quality built from individual or readily available designer plans in above-standard residential tract developments or on an individual property owner's site. The design includes significant exterior ornamentation and interiors that are well finished. The workmanship exceeds acceptable standards and many materials and finishes throughout the dwelling have been upgraded from "stock" standards.

Q4   Dwellings with this quality rating meet or exceed the requirements of applicable building codes. Standard or modified standard building plans are utilized and the design includes adequate fenestration and some exterior ornamentation and interior refinements. Materials, workmanship, finish, and equipment are of stock or builder grade and may feature some upgrades.

Q5   Dwellings with this quality rating feature economy of construction and basic functionality as main considerations. Such dwellings feature a plain design using readily available or basic floor plans featuring minimal fenestration and basic finishes with minimal exterior ornamentation and limited interior detail. These dwellings meet minimum building codes and are constructed with inexpensive, stock materials with limited refinements and upgrades.

Q6   Dwellings with this quality rating are of basic quality and lower cost; some may not be suitable for year-round occupancy. Such dwellings are often built with simple plans or without plans, often utilizing the lowest quality building materials. Such dwellings are often built or expanded by persons who are professionally unskilled or possess only minimal construction skills. Electrical, plumbing, and other mechanical systems and equipment may be minimal or non-existent. Older dwellings may feature one or more substandard or non-conforming additions to the original structure.

## Definitions of Not Updated, Updated, and Remodeled

### Not Updated

Little or no updating or modernization. This description includes, but is not limited to, new homes.
Residential properties of fifteen years of age or less often reflect an original condition with no updating, if no major components have been replaced or updated. Those over fifteen years of age are also considered not updated if the appliances, fixtures, and finishes are predominantly dated. An area that is 'Not Updated' may still be well maintained and fully functional, and this rating does not necessarily imply deferred maintenance or physical /functional deterioration.

### Updated

The area of the home has been modified to meet current market expectations. These modifications are limited in terms of both scope and cost.
An updated area of the home should have an improved look and feel, or functional utility. Changes that constitute updates include refurbishment and/or replacing components to meet existing market expectations. Updates do not include significant alterations to the existing structure.

### Remodeled

Significant finish and/or structural changes have been made that increase utility and appeal through complete replacement and/ or expansion.
A remodeled area reflects fundamental changes that include multiple alterations. These alterations may include some or all of the following: replacement of a major component (cabinet(s), bathtub, or bathroom tile), relocation of plumbing/gas fixtures/appliances, significant structural alterations (relocating walls, and/or the addition of square footage). This would include a complete gutting and rebuild.

## Explanation of Bathroom Count

The number of full and half baths is reported by separating the two values by a period. The full bath is represented to the left of the period. The half bath count is represented to the right of the period.  Three-quarter baths are to be counted as a full bath in all cases. Quarter baths (baths that feature only toilet) are not to be included in the bathroom count.

**ARM'S REPORT**

# Uniform Appraisal Dataset Definitions

File No. SYCAMORE6056

## Abbreviations Used in Data Standardization Text

| Abbrev. | Full Name | Appropriate Fields | Abbrev. | Full Name | Appropriate Fields |
|---------|-----------|--------------------|---------|-----------|--------------------|
| ac | Acres | Area, Site | in | Interior Only Stairs | Basement & Finished Rooms Below Grade |
| AdjPrk | Adjacent to Park | Location | Lndfl | Landfill | Location |
| AdjPwr | Adjacent to Power Lines | Location | LtdSght | Limited Sight | View |
| A | Adverse | Location & View | Listing | Listing | Sale or Financing Concessions |
| ArmLth | Arms Length Sale | Sale or Financing Concessions | MR | Mid-Rise Structure | Design(Style) |
| AT | Attached Structure | Design(Style) | Mtn | Mountain View | View |
| ba | Bathroom(s) | Basement & Finished Rooms Below Grade | N | Neutral | Location & View |
| br | Bedroom | Basement & Finished Rooms Below Grade | NonArm | Non-Arms Length Sale | Sale or Financing Concessions |
| B | Beneficial | Location & View | op | Open | Garage/Carport |
| BsyRd | Busy Road | Location | o | Other | Basement & Finished Rooms Below Grade |
| cp | Carport | Garage/Carport | O | Other | Design(Style) |
| Cash | Cash | Sale or Financing Concessions | Prk | Park View | View |
| CtySky | City View Skyline View | View | Pstrl | Pastoral View | View |
| CtyStr | City Street View | View | PwrLn | Power Lines | View |
| Comm | Commercial Influence | Location | PubTrn | Public Transportation | Location |
| c | Contracted Date | Date of Sale/Time | rr | Recreational (Rec) Room | Basement & Finished Rooms Below Grade |
| Conv | Conventional | Sale or Financing Concessions | Relo | Relocation Sale | Sale or Financing Concessions |
| cv | Covered | Garage/Carport | REO | REO Sale | Sale or Financing Concessions |
| CrtOrd | Court Ordered Sale | Sale or Financing Concessions | Res | Residential | Location & View |
| DOM | Days On Market | Data Sources | RT | Row or Townhouse | Design(Style) |
| DT | Detached Structure | Design(Style) | RH | Rural Housing - USDA | Sale or Financing Concessions |
| dw | Driveway | Garage/Carport | SD | Semi-detached Structure | Design(Style) |
| Estate | Estate Sale | Sale or Financing Concessions | s | Settlement Date | Date of Sale/Time |
| e | Expiration Date | Date of Sale/Time | Short | Short Sale | Sale or Financing Concessions |
| FHA | Federal Housing Authority | Sale or Financing Concessions | sf | Square Feet | Area, Site, Basement |
| g | Garage | Garage/Carport | sqm | Square Meters | Area, Site, Basement |
| ga | Garage - Attached | Garage/Carport | Unk | Unknown | Date of Sale/Time |
| gbi | Garage - Built-in | Garage/Carport | VA | Veterans Administration | Sale or Financing Concessions |
| gd | Garage - Detached | Garage/Carport | wo | Walk Out Basement | Basement & Finished Rooms Below Grade |
| GR | Garden Structure | Design(Style) | wu | Walk Up Basement | Basement & Finished Rooms Below Grade |
| GlfCse | Golf Course | Location | WtrFr | Water Frontage | Location |
| Glfvw | Golf Course View | View | Wtr | Water View | View |
| HR | High Rise Structure | Design(Style) | w | Withdrawn Date | Date of Sale/Time |
| Ind | Industrial | Location & View | Woods | Woods View | View |

## Other Appraiser-Defined Abbreviations

| Abbrev. | Full Name | Appropriate Fields | Abbrev. | Full Name | Appropriate Fields |
|---------|-----------|--------------------|---------|-----------|--------------------|
| | | | | | |

Produced using ACI software, 800.234.8727 www.aciweb.com
Uniform Appraisal Dataset Definitions
1004_06UAD 12172013

**ADDENDUM**

| | |
|---|---|
| Borrower:  6056 SYCAMORE LLC | File No.:  SYCAMORE6056 |
| Property Address:  6056 SYCAMORE TERRACE | Case No.: |
| City:  PLEASANTON | State:  CA | Zip:  94566 |
| Lender:  6056 SYCAMORE LLC | |

**Neighborhood Boundaries**
THE SUBJECT IS BOUNDED BY BERNAL AVENUE-NORTH, PLEASANTON CITY LIMITS-EAST AND SOUTH  AND
FOOTHILL ROAD-WEST.

**Neighborhood Description**
MOSTLY CUSTOM BUILT  HOMES, CONDOMINIUMS AND TOWNHOUSE  OF AVERAGE TO GOOD CONDITION.
FREEWAY 680 CAN BE ACCESSED VIA EAST ON SYCAMORE ROAD TO EAST ON SUNOL BLVD.  MISSION HILLS
PARK WAS NOTED IN THE NEIGHBORHOOD.  ALL OTHER CONVENIENCES ARE WITHIN FIFTEEN (15) MINUTE
DRIVE

**Neighborhood Market Conditions**
THIS MARKET APPEARS STABLE AT THIS TIME AND NO MAJOR CHANGE IN THIS TREND IS EXPECTED IN THE
IMMEDIATE FUTURE.  MARKETING TIME IS  LESS THAN SIX (6)  MONTHS.  FINANCING IS TYPICALLY
CONVENTIONAL.  SELLER CONCESSION IS NOT COMMON.  IF ANY, MAXIMUM  ALLOWABLE BY THE MARKET
WITH NO IMPACT ON VALUES IS 3% OF SALES PRICE.

**Opinion of reasonable Exposure Time**
A REASONABLE EXPOSURE TIME FOR THE SUBJECT PROPERTY AT THE OPINION OF VALUE INDICATED IS
ESTIMATED TO BE BETWEEN 30 TO 90 DAYS AND WAS DERIVED USING AVERAGE DAYS ON MARKET SALES
COMPARABLE IN THE SUBJECT MARKET PLACE WITHIN THE LAST TWELVE (12) MONTHS.

**Condition of the Property**
Continued from Condition of the Property:  AT THE TIME OF INSPECTION.  CARBON MONOXIDE DETECTOR WAS
NOTED AND WATER HEATER TANK WAS PROPERLY BRACED. THE ESTIMATED REMAINING ECONOMIC LIFE OF
THE SUBJECT PROPERTY IS FIFTY (50) YEARS.

 PUBLIC RECORDS (REALQUEST AND REALIST) INDICATES THAT THE SUBJECT PROPERTY IS A CUSTOM BUILT
TWO (2) STORY SINGLE STRUCTURE HOUSE WITH  FOUR (4) BEDROOMS AND FIVE AND A HALF (5.1) BATH
WITH A TOTAL GROSS LIVING AREA OF FIVE THOUSAND FOUR HUNDRED FOURTEEN (5,414 SQ.FT.) SQUARE
FEET.

ACTUAL INSPECTION SHOW A SECOND DETACHED STRUCTURE BUILT AS AN IN-LAW (GUEST HOUSE) UNIT AT
THE BACK OF THE SUBJECT COMPLETE WITH LIVING ROOM, DINING AREA, KITCHEN, BATHROOM AND TWO (2)
BEDROOMS WITH A TOTAL GROSS AREA OF SEVEN HUNDRED FIFTY THREE (753 SQ.FT.) SQUARE FEET BUILT
WITHOUT A CONFIRMED BUILDING PERMIT.  THIS WAS DONE IN A PROFESSIONAL WORKMANLIKE MANNER
AND DOES NOT POSE ANY SAFETY HAZARD. NO VALUE WAS GIVEN TO THIS STRUCTURE ON THIS REPORT AS
THE UNDERSIGNED FOLLOWED THE PUBLIC RECORD.

THE SUBJECT PROPERTY CAN BE REBUILT IF DESTROYED , NO MATTER THE ZONING: LEGAL, LEGAL
NON-CONFORMING OR NO ZONING.

**Prior Sales Comments**
THE SUBJECT PROPERTY LAST TRANSFERRED ON 05/18/2012 PER DOC. #:167666 OF REALQUEST.  IT WAS A
GRANT DEED FROM BOZORGZAD HOSSEIN F TO 6056 SYCAMORE LLC.

THE SUBJECT HAS NO SALE OR TRANSFER IN THE LAST THREE (3) YEARS PRIOR TO THE EFFECTIVE DATE OF
THIS APPRAISAL.

ALL COMPARABLES HAS NO PRIOR SALES OR TRANSFER FOR THE YEAR PRIOR TO THE DATE OF SALE OF
COMPARABLES. ALL HAVE BEEN SOLD IN A NORMAL MARKET TRANSACTION.

**Comments on Sales Comparison**
SIX (6) COMPARABLES WERE USED ON THIS REPORT, COMPS. 1-4 ARE PROPERTIES THAT HAVE CLOSED
ESCROW WITHIN THE LAST SIX (6) MONTHS WHILE COMP 5 IS A PENDING SALE AND COMP 6 IS AN ACTIVE
LISTING.  ALL OF THE COMPARABLES ARE SIMILAR IN OVERALL CONDITION TO THE SUBJECT PROPERTY.

LACK OF VERIFIABLE CLOSED SALES IN THE IMMEDIATE NEIGHBORHOOD OF THE SUBJECT NECESSITATED
THE USE OF COMPS 2, 4 AND 5 WHICH ARE ALL BEYOND THE 1 MILE RADIUS.  THESE COMPARABLES WERE
USED BECAUSE OF ITS SIMILARITY WITH THE SUBJECT PROPERTY IN ROOM COUNT, GROSS LIVING AREA, AGE
AND DESIGN/STYLE.  ALL ARE GOOD INDICATOR OF VALUE.

APPRAISER NOTES THAT COMPARABLE 5 IS LOCATED MORE THAT 3 MILES FROM THE SUBJECT PROPERTY
BUT WAS USED BECAUSE OF LACK OF AVAILABLE PENDING SALE WITHIN THE IMMEDIATE AREA THAT ARE
SIMILAR TO THE SUBJECT.

THE UNDERSIGNED NOTES THAT TWO VALUE CONTRIBUTING LINE ON THE NUMBER OF GARAGE AND NUMBER
OF FIREPLACES WERE NOT BRACKETED DUE TO LACK OF AVAILABLE CLOSED, PENDING AND ACTIVE LISTINGS
WITH SIMILAR FEATURES LIKE THE SUBJECT PROPERTY.

THE COMPARABLES USED ON THIS REPORT ARE DEEMED TO BE THE BEST AVAILABLE AT THIS TIME.

COMP 4 WAS GIVEN A DOWNWARD ADJUSTMENT FOR SUPERIOR VIEW OF CITY LIGHTS AND MOUNTAIN.

THE INGROUND POOL OF THE SUBJECT IS CONSIDERED A SUPER ADEQUACY AND WERE ADJUSTED AS SUCH.

**ADDENDUM**

| Borrower: 6056 SYCAMORE LLC | File No.: SYCAMORE6056 |
|---|---|
| Property Address: 6056 SYCAMORE TERRACE | Case No.: |
| City: PLEASANTON | State: CA | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | |

ADJUSTMENT OF $200.00 FOR DIFFERENCE OF 100 SQ.FT. OR MORE IN GROSS LIVING AREA, $30,000 FOR ROOM COUNT DIFFERENCE, $3.00 PER SQ.FT. IN SITE AREA DIFFERENCE OF 1,000 SQ.FT. OR MORE, $3'000 PER ONE CAR GARAGE AND $2,500 PER FIREPLACE.

NO ADJUSTMENT WERE MADE ON SITE AREA DIFFERENCE OF LESS THAN 1,000 SQ.FT.

NO ADJUSTMENT WERE MADE ON ACTUAL AGE DIFFERENCE OF LESS THAN 5 YEARS.

PATIO, PORCH, DECK ARE ALL EXTERIOR IMPROVEMENTS AND HAS NO IMPACT ON VALUE, HENCE, NO ADJUSTMENTS WERE MADE.

THE SUBJECT IS STRONGLY SUPPORTED AT LOW END OF THE VALUE SPECTRUM. ALL COMPARABLES WHERE USED TO BRACKET THE SUBJECT'S APPRAISED VALUE.

**Extra Comments**

THE FOLLOWING SEARCH PARAMETERS WERE USED IN THIS REPORT ;

NUMBER OF MONTHS BACK: 6 MONTHS

DISTANCE FROM THE SUBJECT PROPERTY: 4 MILE

LIVING AREA DIFFERENCE: 25 %

LAND USE: SAME AS SUBJECT PROPERTY

GEOGRAPHIC OPTIONS: SAME CITY

**HVCC STATEMENT:**
See Attached Addendum

**ARM'S REPORT**

## Market Conditions Addendum to the Appraisal Report   File No. SYCAMORE6056

The purpose of this addendum is to provide the lender/client with a clear and accurate understanding of the market trends and conditions prevalent in the subject neighborhood. This is a required addendum for all appraisal reports with an effective date on or after April 1, 2009.

| | | | |
|---|---|---|---|
| Property Address 6056 SYCAMORE TERRACE | City PLEASANTON | State CA | Zip Code 94566 |
| Borrower 6056 SYCAMORE LLC | | | |

Instructions: The appraiser must use the information required on this form as the basis for his/her conclusions, and must provide support for those conclusions, regarding housing trends and overall market conditions as reported in the Neighborhood section of the appraisal report form. The appraiser must fill in all the information to the extent it is available and reliable and must provide analysis as indicated below. If any required data is unavailable or is considered unreliable, the appraiser must provide an explanation. It is recognized that not all data sources will be able to provide data for the shaded areas below; if it is available, however, the appraiser must include the data in the analysis. If data sources provide the required information as an average instead of the median, the appraiser should report the available figure and identify it as an average. Sales and listings must be properties that compete with the subject property, determined by applying the criteria that would be used by a prospective buyer of the subject property. The appraiser must explain any anomalies in the data, such as seasonal markets, new construction, foreclosures, etc.

| Inventory Analysis | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | 41 | 14 | 2 | ☐ Increasing | ☒ Stable | ☒ Declining |
| Absorption Rate (Total Sales/Months) | 6.83 | 4.67 | 0.67 | ☐ Increasing | ☐ Stable | ☒ Declining |
| Total # of Comparable Active Listings | 60 | 26 | 12 | ☒ Declining | ☐ Stable | ☐ Increasing |
| Months of Housing Supply (Total Listings/Ab. Rate) | 8.78 | 5.57 | 17.91 | ☐ Declining | ☒ Stable | ☐ Increasing |
| Median Sale & List Price, DOM, Sale/List % | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
| Median Comparable Sale Price | 2,031,267 | 1,930,678 | 2,375,000 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Median Comparable Sales Days on Market | 38 | 13 | 20 | ☐ Declining | ☒ Stable | ☐ Increasing |
| Median Comparable List Price | 2,098,041 | 1,951,178 | 2,499,000 | ☐ Increasing | ☒ Stable | ☐ Declining |
| Median Comparable Listings Days on Market | 61 | 49 | 20 | ☒ Declining | ☐ Stable | ☐ Increasing |
| Median Sale Price as % of List Price | 96.81% | 98.94% | 95.03% | ☐ Increasing | ☒ Stable | ☐ Declining |
| Seller-(developer, builder, etc.)paid financial assistance prevalent? | ☐ Yes | ☒ No | | ☐ Declining | ☒ Stable | ☐ Increasing |

Explain in detail the seller concessions trends for the past 12 months (e.g., seller contributions increased from 3% to 5%, increasing use of buydowns, closing costs, condo fees, options, etc.).
FINANCING IS TYPICALLY CONVENTIONAL.  SELLER CONCESSION IS NOT COMMON.  IF ANY, MAXIMUM ALLOWABLE BY THE MARKET WITH NO IMPACT ON VALUES IS 3% OF SALES PRICE.

Are foreclosure sales (REO sales) a factor in the market?  ☐ Yes  ☒ No   If yes, explain (including the trends in listings and sales of foreclosed properties).

Cite data sources for above information.   MLS AND REALQUEST

Summarize the above information as support for your conclusions in the Neighborhood section of the appraisal report form. If you used any additional information, such as an analysis of pending sales and/or expired and withdrawn listings, to formulate your conclusions, provide both an explanation and support for your conclusions.
THE SUBJECT'S MARKET AREA WAS EXPANDED TO INCLUDE A FOUR MILE RADIUS. THIS WAS DONE IN ORDER TO HAVE A LARGER SAMPLE SIZE. HOWEVER, WITHIN THIS RADIUS, NEIGHBORHOODS VARY IN TERMS OF ACTUAL AGE, DESIGN AND APPEAL.    THIS MARKET IS CONSIDERED STABLE AT THIS TIME.  PROPERTIES APPEARS TO BE PROPERLY PRICED AS EVIDENCED BY THE MEDIAN SALE PRICE AS A % OF LIST PRICE AT 95.03% TO 98.94%.  FURTHER EVIDENCE IS THE MEDIAN COMPARABLE SALES DAYS ON MARKET WHICH IS CURRENTLY LESS THAN 90 DAYS.  THERE ARE NO SIGNIFICANT CHANGES EXPECTED IN THIS MARKET. LOCAL AND REGIONAL MARKET DATA INDICATE A STABLE MARKET.

If the subject is a unit in a condominium or cooperative project, complete the following:     Project Name:

| Subject Project Data | Prior 7–12 Months | Prior 4–6 Months | Current – 3 Months | Overall Trend | | |
|---|---|---|---|---|---|---|
| Total # of Comparable Sales (Settled) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Absorption Rate (Total Sales/Months) | | | | ☐ Increasing | ☐ Stable | ☐ Declining |
| Total # of Active Comparable Listings | | | | ☐ Declining | ☐ Stable | ☐ Increasing |
| Months of Unit Supply (Total Listings/Ab. Rate) | | | | ☐ Declining | ☐ Stable | ☐ Increasing |

Are foreclosure sales (REO sales) a factor in the project?  ☐ Yes  ☐ No   If yes, indicate the number of REO listings and explain the trends in listings and sales of foreclosed properties.

Summarize the above trends and address the impact on the subject unit and project.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name ANTONIO R. MERCADO | Name |
| Company Name ARM'S REPORT | Company Name |
| Company Address 2064 MCKENZIE PL., | Company Address |
| SAN JOSE, CA 95131 | |
| State License/Certification # AL031781    State CA | State License/Certification #    State |
| Email Address ginomer@gmail.com | Email Address |

SUBJECT PROPERTY PHOTO ADDENDUM

| Borrower: 6056 SYCAMORE LLC | | File No.: SYCAMORE6056 | |
|---|---|---|---|
| Property Address: 6056 SYCAMORE TERRACE | | Case No.: | |
| City: PLEASANTON | State: CA | | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | | |



FRONT VIEW OF
SUBJECT PROPERTY

Appraised Date: January 23, 2014
Appraised Value: $ 1,920,000



REAR VIEW OF
SUBJECT PROPERTY



STREET SCENE

**SUBJECT PHOTO ADDENDUM**

| Borrower: 6056 SYCAMORE LLC | | File No.: SYCAMORE6056 |
|---|---|---|
| Property Address: 6056 SYCAMORE TERRACE | | Case No.: |
| City: PLEASANTON | State: CA | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | |



RIGHT SIDE OF THE SUBJECT



LEFT SIDE OF THE SUBJECT



PORCH

SUBJECT PHOTO ADDENDUM

| Borrower: 6056 SYCAMORE LLC | | File No.:   SYCAMORE6056 | |
| Property Address: 6056 SYCAMORE TERRACE | | Case No.: | |
| City: PLEASANTON | State: CA | Zip: 94566 | |
| Lender: 6056 SYCAMORE LLC | | | |



PATIO



IN GROUND POOL



BUILT-IN BBQ GRILL

SUBJECT PHOTO ADDENDUM

| | | | |
|---|---|---|---|
| Borrower: 6056 SYCAMORE LLC | | File No.: SYCAMORE6056 | |
| Property Address: 6056 SYCAMORE TERRACE | | Case No.: | |
| City: PLEASANTON | State: CA | | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | | |



ENTRY



LIVING ROOM



DINING ROOM

SUBJECT PHOTO ADDENDUM

| Borrower: 6056 SYCAMORE LLC | | File No.: SYCAMORE6056 |
|---|---|---|
| Property Address: 6056 SYCAMORE TERRACE | | Case No.: |
| City: PLEASANTON | State: CA | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | |



FAMILY ROOM



KITCHEN



NOOK

SUBJECT PHOTO ADDENDUM

| | | |
|---|---|---|
| Borrower: 6056 SYCAMORE LLC | File No.: | SYCAMORE6056 |
| Property Address: 6056 SYCAMORE TERRACE | Case No.: | |
| City: PLEASANTON | State: CA | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | |



WET BAR



BEDROOM 1



BATHROOM 1

| Borrower: 6056 SYCAMORE LLC | | File No.: SYCAMORE6056 |
|---|---|---|
| Property Address: 6056 SYCAMORE TERRACE | | Case No.: |
| City: PLEASANTON | State: CA | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | |



HALF BATH



HOBBY ROOM



BATHROOM 2

ARM'S REPORT

| Borrower: 6056 SYCAMORE LLC | | File No.: SYCAMORE6056 | |
| Property Address: 6056 SYCAMORE TERRACE | | Case No.: | |
| City: PLEASANTON | State: CA | | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | | |



BEDROOM 2



BATHROOM 3



BEDROOM 3

ARM'S REPORT

| Borrower: 6056 SYCAMORE LLC | | File No.: SYCAMORE6056 | |
| Property Address: 6056 SYCAMORE TERRACE | | Case No.: | |
| City: PLEASANTON | State: CA | | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | | |



BATHROOM 4



LAUNDRY ROOM
SECOND FLOOR



OFFICE

| Borrower: 6056 SYCAMORE LLC | | File No.: SYCAMORE6056 | |
|---|---|---|---|
| Property Address: 6056 SYCAMORE TERRACE | | Case No.: | |
| City: PLEASANTON | State: CA | Case No.: | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | | |



MASTER BEDROOM ENTRY



MASTER BEDROOM



MASTER BATHROOM
JACUZZI



MASTER BEDROOM FIREPLACE

ARM'S REPORT

| Borrower: 6056 SYCAMORE LLC | | File No.: SYCAMORE6056 | |
|---|---|---|---|
| Property Address: 6056 SYCAMORE TERRACE | | Case No.: | |
| City: PLEASANTON | State: CA | | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | | |



LOFT



GYM ROOM



MECHANICAL ROOM
SECOND FLOOR



CARBON MONOXIDE DETECTOR
SECOND FLOOR

ARM'S REPORT

| | | | | |
|---|---|---|---|---|
| Borrower: 6056 SYCAMORE LLC | | | File No.: | SYCAMORE6056 |
| Property Address: 6056 SYCAMORE TERRACE | | | Case No.: | |
| City: PLEASANTON | | State: CA | | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | | | |



GARAGE
FRONT VIEW



GARAGE INTERIOR



WATER HEATER TANK
GARAGE



CARBON MONOXIDE DETECTOR
GROUND FLOOR

**ARM'S REPORT**

| Borrower: 6056 SYCAMORE LLC | | File No.: SYCAMORE6056 | |
|---|---|---|---|
| Property Address: 6056 SYCAMORE TERRACE | | Case No.: | |
| City: PLEASANTON | State: CA | | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | | |



VIEW FROM PORCH



VIEW FROM MASTER BEDROOM



VIEW FROM BEDROOM 2



ARM'S REPORT

| Borrower: 6056 SYCAMORE LLC | | File No.: SYCAMORE6056 | |
| Property Address: 6056 SYCAMORE TERRACE | | Case No.: | |
| City: PLEASANTON | State: CA | | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | | |



IN-LAW UNIT
FRONT VIEW



REAR VIEW



LIVING ROOM



DINING AREA

**ARM'S REPORT**

| | |
|---|---|
| Borrower: 6056 SYCAMORE LLC | File No.: SYCAMORE6056 |
| Property Address: 6056 SYCAMORE TERRACE | Case No.: |
| City: PLEASANTON    State: CA | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | |



KITCHEN



BEDROOM 1



BEDROOM 2



BATHROOM

COMPARABLE PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Borrower: 6056 SYCAMORE LLC | File No.: SYCAMORE6056 |
| Property Address: 6056 SYCAMORE TERRACE | Case No.: |
| City: PLEASANTON | State: CA   Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | |



COMPARABLE SALE #1

1037 SUNSET CREEK LANE
PLEASANTON, CA 94566
Sale Date: s07/12;c06/12
Sale Price: $ 1,782,000



COMPARABLE SALE #2

1185 LAGUNA CREEK LANE
PLEASANTON, CA 94566
Sale Date: s09/13;c09/13
Sale Price: $ 1,897,500



COMPARABLE SALE #3

5693 ELLIS COURT
PLEASANTON, CA 94566
Sale Date: s11/13;c10/12
Sale Price: $ 1,975,000

COMPARABLE PROPERTY PHOTO ADDENDUM

| | |
|---|---|
| Borrower: 6056 SYCAMORE LLC | File No.: SYCAMORE6056 |
| Property Address: 6056 SYCAMORE TERRACE | Case No.: |
| City: PLEASANTON    State: CA | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | |



COMPARABLE SALE #4

3785 SMALLWOOD COURT
PLEASANTON, CA 94566
Sale Date: s09/13;c06/12
Sale Price: $ 2,270,500



COMPARABLE SALE #5

2792 SPOTORNO COURT
PLEASANTON, CA 94566
Sale Date: c01/14
Sale Price: $ 1,900,000



COMPARABLE SALE #6

1032 SYCAMORE CREEK WAY
PLEASANTON, CA 94566
Sale Date: Active
Sale Price: $ 2,299,950

FLOORPLAN SKETCH

| | | | |
|---|---|---|---|
| Borrower: 6056 SYCAMORE LLC | | File No.: SYCAMORE6056 | |
| Property Address: 6056 SYCAMORE TERRACE | | Case No.: | |
| City: PLEASANTON | | State: CA | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | | |



SECOND FLOOR

IN-LAW UNIT

FIRST FLOOR

Comments:

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Size | Net Totals |
| GLA1 | First Floor | 3102.59 | 3102.59 |
| GLA2 | Second Floor | 2250.34 | 2250.34 |
| GAR | Garage | 1345.72 | 1345.72 |
| | | | |
| TOTAL LIVABLE (rounded) | | | 5353 |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| First Floor | | |
| | 19.0 x 32.0 | 608.00 |
| | 6.0 x 22.0 | 132.00 |
| | 6.5 x 14.0 | 91.00 |
| 0.5 x | 0.2 x 21.4 | 1.89 |
| | 13.0 x 32.0 | 416.00 |
| | 6.0 x 20.0 | 120.00 |
| | 7.0 x 14.0 | 98.00 |
| | 12.8 x 32.0 | 408.00 |
| 0.5 x | 2.3 x 2.3 | 2.64 |
| 0.5 x | 4.3 x 8.7 | 18.47 |
| | 7.8 x 20.1 | 155.44 |
| 0.5 x | 7.3 x 14.2 | 51.42 |
| 0.5 x | 5.9 x 5.6 | 16.49 |
| 0.5 x | 9.6 x 10.0 | 48.14 |
| | 8.1 x 10.0 | 81.52 |
| 83 unlisted calculations | | 3103.92 |
| 98 Calculations Total (rounded) | | 5353 |

DIMENSION LIST ADDENDUM

| Borrower: 6056 SYCAMORE LLC | | File No.: SYCAMORE6056 |
|---|---|---|
| Property Address: 6056 SYCAMORE TERRACE | | Case No.: |
| City: PLEASANTON | State: CA | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | |

| GROSS BUILDING AREA (GBA) | 5,353 | | |
|---|---|---|---|
| GROSS LIVING AREA (GLA) | 5,353 | | |
| Area(s) | Area | % of GLA | % of GBA |
| Living | 5,353 | | 100.00 |
| Level 1 | 3,103 | 57.97 | 57.97 |
| Level 2 | 2,250 | 42.03 | 42.03 |
| Level 3 | 0 | 0.00 | 0.00 |
| Other | 0 | 0.00 | 0.00 |
| Basement ☐ GBA | 0 | | |
| Garage ☐ | 1,346 | | |

| Area Measurements | | | Area Type | | | | | |
|---|---|---|---|---|---|---|---|---|
| Measurements | Factor | Total | Level 1 | Level 2 | Level 3 | Other | Bsmt. | Garage |

DIM-02092003

PLAT MAP

| Borrower: 6056 SYCAMORE LLC | | File No.: SYCAMORE6056 |
|---|---|---|
| Property Address: 6056 SYCAMORE TERRACE | | Case No.: |
| City: PLEASANTON | State: CA | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | |



LOCATION MAP

| Borrower: 6056 SYCAMORE LLC | File No.: SYCAMORE6056 |
| Property Address: 6056 SYCAMORE TERRACE | Case No.: |
| City: PLEASANTON | State: CA | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | | |



**ARM'S REPORT**

| Borrower: 6056 SYCAMORE LLC | File No.: SYCAMORE6056 |
| Property Address: 6056 SYCAMORE TERRACE | Case No.: |
| City: PLEASANTON | State: CA | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC |



**ARM'S REPORT**

| | |
|---|---|
| Borrower: 6056 SYCAMORE LLC | File No.:  SYCAMORE6056 |
| Property Address: 6056 SYCAMORE TERRACE | Case No.: |
| City: PLEASANTON | State: CA | Zip: 94566 |
| Lender: 6056 SYCAMORE LLC | |



**FREA**

**COVER NOTE**

**INSURED:** Antonio R Mercado

**MAILING ADDRESS:** 1685 Lederer Cir
San Jose, CA 95131

*This is to certify that the undersigned has procured insurance coverage as hereafter specified from certain companies and/or underwriters.*

**EFFECTIVE: 04/05/2013      EXPIRATION: 04/05/2014      RETROACTIVE: 04/05/2011**

**COVERAGE:** FREA Errors & Omissions Professional Liability Policy

Profession: Real Estate Appraiser
Claims Made Form: 90395 (3/06)
Limits: Per Occurrence:  $1,000,000   Annual Aggregate: $1,000,000
$1,000 Retention each wrongful act

**CONDITIONS:**

Real Estate Agent/ Broker Referral Indemnity
Known wrongful act exclusion
Pending/prior litigation exclusion
Defense within policy limit

**COMPANIES PARTICIPATING:**
National Union Fire Insurance Company of Pittsburgh, PA

**COVER NOTE # Z FRE,4 12-8101**
**CUSTOMER # 0027689**

Issued at:  2645 Financial Ct., Suite A
San Diego, CA 92117

**DATE: 03/26/2013**                    By:  *mendoza*

Insurance, when effected shall be subject to all terms and conditions of policy(ies) which will be issued, and in the event of any inconsistency herewith, the terms and provisions of the policy prevail.



Subject Front View



Title



Subject Rear View



Subject Street Scene



Extra Photo 1



Extra Photo 2



Extra Photo 3



Extra Photo 1



Extra Photo 2



Extra Photo 3



Extra Photo 1



Extra Photo 2



Extra Photo 3



Extra Photo 1



Extra Photo 2



Extra Photo 3



Extra Photo 1



Extra Photo 2

Thumbnails

File No.   SYCAMORE6056



Extra Photo 3



Extra Photo 1



Extra Photo 2



Extra Photo 3



Extra Photo 1



Extra Photo 2



Extra Photo 3



Extra Photo 1



Extra Photo 2



Extra Photo 3



Extra Photo 1



Extra Photo 2



Extra Photo 3



Extra Photo 4



Extra Photo 1



Extra Photo 2



Extra Photo 3



Extra Photo 4



Extra Photo 1



Extra Photo 2



Extra Photo 3



Extra Photo 4



Extra Photo 1



Extra Photo 2



Extra Photo 3

Extra Photo 4



Extra Photo 1



Extra Photo 2



Extra Photo 3



Extra Photo 4



Extra Photo 1



Extra Photo 2



Extra Photo 3



Extra Photo 4



Sales Comp. 1



Sales Comp. 2



Sales Comp. 3



Sales Comp. 4



Sales Comp. 5



Sales Comp. 6



License Image



License Image



Plat Map



Location Map